IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DR. SUSAN M. KEGERISE,         :
        Plaintiff            :
                             :
   vs.                         :   CIVIL NO. 1:CV-14-0747
                             :
SUSQUEHANNA TOWNSHIP           :   (Judge Caldwell)
SCHOOL DISTRICT, et al.,       :
        Defendants            :
                             :

*M E M O R A N D U M*

I. *Introduction*

      Plaintiff is Dr. Susan M. Kegerise, the former superintendent of the Susquehanna Township School District.[1]  The defendants are the School District and three members of the District's School Board, Carol L. Karl, Jesse Rawls, Sr., and Mark Y. Sussman.  Plaintiff mainly alleges that the Board constructively discharged her from her job and that in doing so, it acted on the basis of racial, gender and age discrimination. Plaintiff also claims a due process violation and a breach of her employment contract because the discharge occurred without notice or a hearing.

      Plaintiff's Amended Complaint sets forth ten causes of action.  Pursuant to Fed. R. Civ. P. 12(b)(6), Defendants have filed a motion to dismiss all of the claims, asserting that none of them is meritorious.

---

    [1]  In a state-court action for mandamus, *Kegerise v. DelGrande*, No. 2014-CV-3793 (Pa. Ct. Com. Pl. Dauphin Cnty.), Plaintiff was recently ordered to be reinstated to her position. That order has been stayed pending an appeal.

II.   *Standard of Review*

Fed. R. Civ. P. 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted."  In considering a motion to dismiss under Rule 12(b)(6), "[w]e 'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'"  *Byers v. Intuit, Inc.,* 600 F.3d 286, 291 (3d Cir. 2010)(quoted case omitted).

A complaint need only contain "a short and plain statement of the claim," Fed*.* R. Civ. P. 8(a)(2), and detailed factual allegations are not required, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007). Nonetheless, the complaint still has to plead "enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570, 127 S.Ct. 1955 at 1974.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)(quoting *Twombly*, 550 U.S. at 556, 127 S.Ct. at 1965). "[L]abels and conclusions" are not enough, *Twombly,* 550 U.S. at 555, 127 S.Ct. at 1964-65, and a court "'is not bound to accept as true a legal conclusion couched as a factual allegation.'"  *Id.*, 127 S.Ct. at 1965 (quoted case omitted).

With this standard in mind, we set forth the background to this litigation, as Plaintiff alleges it in her Amended Complaint.

-2-

III.   *Background*

The Amended Complaint alleges as follows.  Plaintiff was the Susquehanna Township School District's assistant superintendent from 2006 until January 2010.  (Am. Compl. ¶ 17).  She was promoted to superintendent and given a three-year contract running from January 6, 2010, through January 6, 2013.  (*Id.* ¶ 18).  She is at least forty years old.  (*Id.* ¶ 19).  Defendants Karl, Rawls, and Sussman are elected members of the School Board.  (*Id.* ¶¶ 6, 7, and 8).  The superintendent is an ex officio member of the Board.  (*Id.* ¶ 26).  Rawls was Board president from December 2011 until December 2012.  (*Id.* ¶ 24).  On November 5, 2013, he was reelected to the Board, and Karl was elected to the Board for the first time.  (*Id.* ¶ 73).  In December 2013, Rawls became the Board's vice-president.  (*Id.* ¶ 7).

Plaintiff asserts that during her term as superintendent, she was "subjected to physical intimidation, verbal abuse, sabotage of [the] district image and administration performance, discrimination on the basis of race, sex and age, and micromanagement by members of the School Board of Directors and the Board as a whole."  (*Id.* ¶ 2).  The following allegations provide detail.

On or about March 5, 2012, defendant Rawls, then the Board president, called a meeting of the Board without telling Plaintiff and during that meeting the Board hired an interim solicitor.  (*Id.* ¶ 27).  On August 20, 2012, the Board met in executive session to discuss a personnel and student-safety issue.  The district solicitor asked Rawls to recuse himself from the meeting because a relative of Rawls was a possible

witness.  Rawls refused to do so and threatened legal action in response.  The Board and

Dr. Kegerise did not receive a full briefing as a result of Rawls' decision not to recuse.

(*Id.* ¶ 28).  On or about September 25, 2012, Rawls attempted to have a conversation

with the District's high school principal "which was critical" of the District's "central

administration."  (*Id.* ¶ 29).  Rawls also approached a union official to suggest that the

union "file a grievance against [the District] regarding a personnel issue."  (*Id.* ¶ 30).

"Defendant Rawls has publically and privately advocated for, even

demanded, the hiring of minority teachers and administrators, even expressing that [the

District] should hire 'more Black males' because the Superintendent is Caucasian."  (*Id.* ¶

34).  The District has an established merit-selection system for hiring teachers and

administrators.  (*Id.* ¶ 31).  Factors considered are "certifications, work experience,

education level, job related skills, interview performance and references."  (Id. ¶  33).

"At one point, Defendant Rawls told Dr. Kegerise as Superintendent that

she was white and the whites would listen to her because 'you think like them.'"  (*Id.* ¶

35).  "In the same conversation, Defendant Rawls relayed to Dr. Kegerise that she would

pave the way for an African American male to replace her and said that is what his friend

Major [Poteat] did in the Harrisburg School District."  (*Id.* ¶ 36).  Apparently, Rawls

expressed this opinion to Dr. Kegerise on a second occasion.  (*Id.* ¶ 42).  Rawls "has

publicly referred to Plaintiff as a 'bitch' and that the [District] is run by 'three white

bitches.'"  (*Id.* ¶ 43).  Rawls made the "three white bitches" statement in "one or more

instances."  (*Id.* ¶ 59).

"On or about May 27, 2010, Defendant Rawls voted against the hiring of Assistant Superintendent Dr. Cathy Taschner, citing his belief that an African-American should have been hired for the position instead." (*Id.* ¶ 39). "On or about November 19, 2012, Defendant Rawls voted against the hiring of an assistant principal, citing insufficient information about the applicant." (*Id.* ¶ 40). However, when the assistant principal was introduced to the Board at a later meeting, "Defendant Rawls became visibly angry" when he saw that the man was "African-American and yelled at Plaintiff 'I should know [the applicant's race] ahead of time.'" (*Id.* ¶ 41)(brackets in original).

On or about December 12, 2012, at the request of the Board, Plaintiff left a Board meeting because it was going to discuss her contract. (*Id.* ¶ 44). However, the Board, led by Rawls, then had a discussion, in addition to Plaintiff's contract, about personnel issues unrelated to Plaintiff's contract, a discussion for which she could have been present. (*Id.* ¶ 45).

Resumes and other application documents are not permitted to be taken home because of privacy concerns. (*Id.* ¶ 38). On or about May 13, 2010, when he was not permitted to take these documents home, "Defendant Rawls, a former college wrestler, became visibly angry and verbally and physically threatened Dr. Kegerise." (*Id.*). Rawls stopped only when he realized there were two witnesses to his conduct. (*Id.*).

District Policy 907 prohibits Board members from engaging directly with District employees because of possible liability concerns and undermining of the

administration.  (*Id.* ¶ 47).  "On February 15, 2013, Defendant Rawls visited the District

Middle School and High School without giving prior notice to the administration."  (*Id.* ¶

46).  In 2013, a long-time high school gym teacher agreed to a transfer to an elementary

school.  (*Id.* ¶ 48).  Rawls believed the teacher was not in fact agreeable to the transfer

and that the transfer was discriminatory.  (*Id.*).  "Rawls attempted to intervene by

usurping the role and judgment of the Administration."  (*Id.*).  He even "approach[ed] the

president of the teacher's union, stating the transfer should be 'grieved' by the district."

(*Id.*).

   "On January 28, 2013, Defendant Rawls, at a public meeting of the Board,

falsely accused Plaintiff of nepotism as grounds to not renew her contract."  (*Id.* ¶ 50). His

remarks could be understood as "an accusation that the Plaintiff hired an underqualified

family member over more qualified applicants."  (*Id.* ¶ 162).  Specifically, Rawls stated:

> There was a time that we interviewed for counselors for the
> high school K through twelve and I know you had eight or nine
> candidates that were certified K through twelve.  But we didn't
> hire those people because we wanted to hire the
> Superintendent's niece, which we did.  Which was wrong.
> And I asked her about it.  Now, I'm finding out that we are
> paying for her certification to be . . .
>
> . . . .
>
> [W]e all want our friends hired, sometimes.  Nothing wrong
> with that.  But when it comes to relatives, when it comes to
> people that's not qualified, when you say, Dr. Taschner says
> we only hire the best qualified, ok, so if you have eight people
> that are certified K through twelve for counselors, and we
> didn't move personnel down to make room, and not hire one
> of those eight people but we go back and get someone that
> wasn't certified K through twelve, I have a problem with that.

> And the Superintendent did write, send an email, said that she
> does the hiring.  She recommend (sic) the hiring to the Board,
> so she is responsible.

(*Id.* ¶ 157).  A special investigation cleared Plaintiff of any wrongdoing.  (*Id.* ¶ 51).  On

September 23, 2013, the Board "issued an apology" for the false accusation of nepotism,

to the employee who had been hired, not Plaintiff.  (*Id.* ¶¶ 52 and 163).

"On March 12, 2013, Defendant Rawls approached a district custodian

regarding whether another employee should have been terminated.  The propriety of the

termination was pending arbitration at the time.  Defendant Rawls further stated to the

employee that the union should have helped the terminated employee and district

employees should start using ASFME (sic) as their union instead of [the] Teamsters."  (*Id.*

¶ 54).  In an executive session of the Board, Rawls accused Plaintiff of fabricating this

incident "by threatening to fire the custodian if he did not make something up about

Defendant Rawls."  (*Id.* ¶ 55).  The District solicitor "spoke with the custodian who

confirmed the accuracy of the report and denied any threat by Plaintiff."  (*Id.* ¶ 56).  At a

meeting of the Board on April 9, 2013, Plaintiff and the solicitor confronted Rawls about

the inappropriateness of his discussion with the custodian and its potential for liability.

(*Id.* ¶ 57).  "Rawls responded by violently slapping his hands on a table and yelling a

string of profane references to Dr. Kegerise and the Solicitor."  (*Id.*).  "Defendant Rawls'

actions at the meeting on April 9, 2013, were perceived by Dr. Kegerise and other

members of the Board as threatening towards Dr. Kegerise."  (*Id.* ¶ 58).

On April 22, 2013, by a six-to-three vote, the Board ratified a new contract with Plaintiff.  (*Id.* ¶¶ 60 and 62).  Defendants Rawls and Sussman voted against it.  (*Id.* ¶ 62).  In pertinent part, the contract was effective for four and one-half years, running from January 1, 2013, through June 30, 2017.  (Am. Compl. Ex. B, employment agreement, Art. 3.00).  The contract provides that the Board could only terminate it on the grounds specified in 24 Pa. Stat. Ann. § 11-1122, including incompetency and persistent negligence.  (Am. Compl. Ex. B, Art. 8.00(b)).  And before removing the superintendent, the contract obligated the Board to provide her with a hearing, along with other due process requirements, pursuant to 24 Pa. Stat. Ann. § 10-1080.  (*Id.*, Art. 8.00(a)).  Removal could only be by a two-thirds vote of the Board (six members of the nine-person board).  (*Id.*).

On October 31, 2013, defendants Rawls and Sussman announced their intent to file a lawsuit against the Board and Plaintiff seeking to void the contract.  (*Id.* ¶ 63).  In October 2013, Sussman, under the user name moderatecommmonsense, posted a comment to an article on Pennlive.com indicating that Plaintiff should get her resume ready as there were enough votes on the Board to fire her.  (*Id.* ¶¶ 64 and 66).[2]  On October 31, 2013, Sussman, under the user name DumbandDumber, posted a comment to an article on Pennlive.com asserting that Plaintiff could now be fired without any financial repercussions because she was responsible for the hiring of Shawn Sharkey.[3]

---

[2] Pennlive.com is the website of the local newspaper, *The Harrisburg Patriot-News*.

[3] Shawn Sharkey was an assistant principal at the high school who was charged criminally for sexual misconduct with a high school student.  See note 6 below.

The comment also complained about certain costs, the costs of hiring a friend of Plaintiff to be a communications director, the salary of Plaintiff's niece, and $30,000 worth of office equipment in Plaintiff's office.  (*Id.* ¶¶ 65 and 66).

On November 1, 2013, Bret Keisling, Rawls and Sussman's attorney in the lawsuit (that had not yet been filed) appeared uninvited with them at the District's administration building "with multiple reporters and cameras."  (*Id.* ¶ 67).  Keisling yelled at Plaintiff about the intended lawsuit.  (*Id.* ¶ 69).  When the District solicitor told Keisling that Plaintiff was his client and that he should not speak to her, Keisling ignored him and "continued to yell at Dr. Kegerise in a loud and aggressive tone."  (*Id.* ¶ 70).  "Keisling then threatened to falsely accuse [the solicitor] of assaulting him and later made such false accusations to the assembled media."  (*Id.* ¶ 71).  "Dr. Kegerise was so threatened by Keisling's actions that she instructed a fellow administrator to call 911 and summon law enforcement."  (*Id.* ¶ 72).

On November 25, 2013, almost a month after they had announced their intention to do so, Rawls and Sussman filed their lawsuit, doing so in this court, and naming the Board, the District and Plaintiff as defendants.  (*Id.* ¶ 74; Doc. 4, Am. Compl. Ex. D).[4]  On January 15, 2014, the District solicitor wrote to Keisling, stating that sanctions under Fed. R. Civ. P. 11 would be sought because the complaint was frivolous.

---

[4] The case was captioned *Rawls v. Susquehanna Township School Board of Directors*, docketed at No. 1:13-CV-2867 (M.D. Pa.), and assigned to the Hon. John E. Jones III.

(*Id.* ¶ 75).  On January 21, 2014, Rawls and Sussman filed an amended complaint naming only Dr. Kegerise as the defendant.  (*Id.* ¶ 76).

On February 7, 2014, Plaintiff's counsel in the instant lawsuit wrote to Keisling advising him that he would be seeking sanctions under Fed. R. Civ. P. 11 in the Rawls and Sussman lawsuit because the amended complaint was frivolous.  (*Id.* ¶ 80).  "On March 4, 2014, Defendants Rawls and Sussman discontinued their federal lawsuit against Dr. Kegerise without any type of settlement."  (*Id.* ¶ 82).  On or about March 4, 2014, Rawls and Sussman announced they were withdrawing their lawsuit "because 'the reasons for filing this action have been corrected as a result of community and media interest in this case and recent events.'" (*Id.* ¶ 83; Doc. 4, Ex. I).

In the meantime, on January 31, 2014, Rawls "publicly demanded the resignation of Dr. Kegerise as Superintendent."  (*Id.* ¶ 77).  On February 1, 2014, defendant Karl was quoted in a newspaper article demanding the resignations of Plaintiff and assistant superintendent Dr. Cathy Taschner, (*id.* ¶ 78; Doc. 4, Ex. G),[5] and on February 3, 2014, she "signed a petition demanding Plaintiff's resignation."  (*Id.* ¶ 79).

"On or about February 24, 2014, the Board met in executive session, whereupon Dr. Kegerise's representative was directed by the district solicitor to leave without reason."  (*Id.* ¶ 81).  The representative had been sent as part of a routine practice when the superintendent was absent attending a conference.  (Am. Compl., p. 16 n.1).

_____

[5]  We note the newspaper article indicates that only Rawls had made these demands.

"In early March 2014, Defendants Karl and Sussman and Attorney Keisling brought members of the local media to a community meeting with a local realtor." (*Id.* ¶ 84).  "[T]he purpose of the meeting was to obtain statistics showing reduced demand for homes within Susquehanna Township in an effort to portray [the District] as dysfunctional and harmful to property values." (*Id.* ¶ 85).  "When informed by the realtor that home prices in Susquehanna Township have increased at a greater rate than neighboring Lower Paxton Township and Dauphin County as a whole, the meeting promptly ended." (*Id.* ¶ 86).

On or about May 21, 2013, there was a rumor in the high school "regarding a text or photo on a student's cellular telephone." (*Id.* ¶ 87).  The District administration investigated the rumor. (*Id.* ¶ 88).  A Dauphin County grand jury reviewed the administration's investigation. (*Id.* ¶ 89).  On January 30, 2014, the grand jury concluded that criminal charges were not warranted for the manner in which the District handled the investigation because the District had acted upon the advice of counsel. (Doc. 4-10, ECF pp. 9-10, Grand Jury Report, Ex. J to the Amended complaint).[6]  On March 11, 2014, the Board started another investigation into the administration's handling of the Sharkey matter, "after the administration's original investigation, law enforcement's investigation, and the Dauphin County District Attorney's Grand Jury Investigation." (*Id.* ¶ 91).  "[T]his

---

[6]  As set forth in the grand jury report, the District investigation dealt with Shawn Sharkey, an assistant principal at the high school.  The District had investigated a rumor concerning a text and a picture related to Sharkey and a student.  According to the report, it later turned out after a police investigation that Sharkey had been having sexual relations with the student.  Sharkey was criminally charged for his alleged conduct with the student.

fourth investigation . . . is a witch hunt in order to find some minimally plausible cause to terminate Dr. Kegerise." (*Id.* ¶ 92).

The Board has violated its own policies "in an attempt to usurp Dr. Kegerise's authority within the District and prevent her from performing her duties as Superintendent." (*Id.* ¶ 93). The Board has violated Board Policy 7112 by dealing with complaints itself rather than allowing the administration to do so. (*Id.* ¶ 93(a)). The Board has violated Board Policy 304 by periodically not allowing the administration to hire for non-administrative positions between board meetings and without prior board approval when Policy 304 confers that authority on the administration. (*Id.* ¶ 93(b)). The Board has violated Board Policy 903, which outlines procedure for public participation at Board meetings, "to hinder [and] undermine the administration and its effectiveness." (*Id.* ¶ 93(c)). In violation of the Policy, the Board has "allow[ed] and/or encourag[ed] members of the public to speak about confidential personnel issues, display signs and disrupt speakers." (*Id.*). Pursuant to Board policy, "only the Superintendent can recommend new positions within the [District]." (*Id.* ¶ 93(d)). However, on April 11, 2014, "the Board and Solicitor met with Assistant Superintendent Taschner to post an employment position opening for a new position within the School District." (*Id.*). And as of April 15, 2014, "the School Board has appointed a committee consisting of Defendants Rawls and Sussman, as well as Board President John Dietrich, for the sole purpose of conducting interviews and hiring of a District Business Manager." (*Id.* ¶ 93(e)).

"Dr. Kegerise has been on leave from her position since March 24, 2014 due to medical reasons." (*Id.* ¶ 94).  On April 16, 2014, Attorney Miller, an attorney for the Board, sent Plaintiff's counsel a letter stating that Plaintiff "is and remains the Superintendent . . . ." (*Id.* ¶ 95; Doc. 4-14, ECF p. 1, Ex. N to Am. Compl.).  The letter also asserted that Plaintiff's counsel had previously indicated that Plaintiff had been "constructively terminated," or that she had not been at work because of a "work-related injury." (*Id.*).  The letter also noted that Plaintiff had been sent forms necessary to apply for leave under the Family and Medical Leave Act.  (*Id.*; Am. Compl. ¶ 96).

On April 17, 2014, Plaintiff filed the original Complaint in this action.  (*Id.* ¶ 97).  "On April 21, 2014, the Board, as a last minute addition to the agenda halfway through the board meeting, voted to approve the acceptance of Plaintiff's "'Resignation.'" (*Id.* ¶ 100).  Plaintiff never tendered a resignation nor did she ever formally resign from her position.  (*Id.* ¶¶ 101 and 104).  Her "petitioning the government for redress of her grievances," a reference to her original Complaint, "was construed as a resignation . . . ." (*Id.* ¶ 102).

Plaintiff sets forth ten causes of action.  In Count I, she makes a claim against the Board for "constructive termination" on the grounds that the conduct of the Board and its members, both in harassing her and in taking over her duties, prevented her from doing her job, resulting in her constructive discharge without notice or a hearing.  In Count II, she makes a claim against the Board, Karl, Rawls and Sussman for violation of due process on the ground that her constructive termination was done without notice

or a hearing.  In Count III, she makes a breach-of-contract claim against the Board for constructive termination of her employment without the notice and hearing required by her contract.  In Count IV, she makes a claim against Karl, Rawls, and Sussman for tortious interference with contract.  In Count V, she makes a claim against Rawls for defamation based on his statement that she had engaged in nepotism by hiring an unqualified niece.  In Count VI, she makes a claim against Karl and Rawls for intentional infliction of emotional distress.  In Count VII, she makes a state-law claim against Rawls and Sussman for wrongful use of civil proceedings for their filing of *Rawls v. Susquehanna Township School Board of Directors*, No. 1:13-CV-2867 (M.D. Pa.).  In Count VIII, she makes a claim against the District for retaliatory termination in violation of the Family and Medical Leave Act (FMLA), 29 U.S.C. §§ 2601-2654.  In Count IX, she makes a claim under the First Amendment against the District, Karl, Rawls, and Sussman for termination in retaliation for the filing of this lawsuit.  In her second Count IX (and her tenth cause of action), she makes a claim under Pa. Const. art 1, § 20 against the District, Karl, Rawls, and Sussman for termination in retaliation for the filing of this lawsuit.

IV.   *Discussion*

A.  *Count I: The Constructive Termination Claim*

Plaintiff does not allege the authority under which she brings her constructive termination claim.  Based on the cases she cites in her opposition brief, she

-14-

appears to be making a federal claim under Title VII, 42 U.S.C. § 2000e-2(a), and a

state-law claim under 43 Pa. Stat. Ann. § 955(a).  We will address both claims using

federal law.  *See Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 409 (3d Cir.

1999)(analysis is the same for Title VII and PHRA claims).  We note that Plaintiff herself

relies in relevant part on federal law.

> To set forth a constructive discharge claim, Plaintiff must make allegations

showing that "the employer knowingly permitted conditions of discrimination in

employment so intolerable that a reasonable person subject to them would resign."  *Goss*

*v. Exxon Office Systems Co.*, 747 F.2d 885, 880 (3d Cir. 1984).  In setting forth her claim,

Plaintiff relies on allegations that she was subjected to a hostile work environment.  A

plaintiff can rely on allegations of a hostile work environment to support a constructive

discharge claim, but "[a] hostile work environment 'will not always support a finding of

constructive discharge.'"  *Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 317 n.4 (3d

Cir. 2006)(quoting *Marrero v. Goya of Puerto Rico, Inc.*, 304 F.3d 7, 28 (1st Cir. 2002)).

"'To prove constructive discharge, the plaintiff must demonstrate a greater severity or

pervasiveness of harassment than the minimum required to prove a hostile working

environment.'"  *Id.* (quoting *Landgraf v. USI Film Products,* 968 F.2d 427, 430 (5th Cir.

1992)).

> The Third Circuit recently summarized the law on a hostile work

environment:

>> To demonstrate a hostile work environment, a plaintiff must
>> show (1) she suffered intentional discrimination because of

her sex or race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex [or race] in that position; and (5) respondeat superior liability exists. *Andrews v. City of Phila.,* 895 F.2d 1469, 1482 (3d Cir. 1990).

*Greer v. Mondelez Global, Inc.,* ___ F. App'x ___, ___, 2014 WL 5351829, at *2 (3d Cir. 2014)(nonprecedential).  On the second element, the court stated:

> The threshold for pervasiveness and regularity of discriminatory conduct is high. A hostile work environment is actionable under Title VII only if it is so severe and pervasive that it "alters the conditions of the victim's employment" and creates an "abusive working environment." *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 270 (2001).  The environment must be objectively hostile, not just hostile in the plaintiff's view.  *See Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993).  Whether an environment is sufficiently hostile or abusive is determined by considering the totality of the circumstances, including the "frequency of the conduct; its severity, and whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Breeden,* 532 U.S. at 271 (quotation marks and internal citations omitted).

*Id.* The court added: "Simple teasing, offhand comments, and isolated incidents do not amount to discriminatory changes in the terms and conditions of employment." *Id.* (internal quotation marks and quoted cases omitted).

In moving to dismiss Count I, Defendants argue that there are no allegations supporting the first element of a hostile work environment claim, that there was intentional discrimination because of sex or race.  In support, Defendants point to six paragraphs of the Amended Complaint, paragraphs 34, 35, 39, 41 and 43, as the only allegations relating in some way to discrimination and that they only do that because they

-16-

involve the topic of race.  In opposition, Plaintiff counters that she has alleged "derogatory and gender-based hostility by Defendants," driven by their "desire to hire an African-American male superintendent and opposition to Plaintiff's refusal to implement illegal discriminatory race-based hiring."  (Doc. 24, Opp'n Br. at pp. 21-22).

Defendants also argue that the allegations are insufficient concerning the second element, that Defendants' conduct was so severe and pervasive that it altered the conditions of Plaintiff's employment and created an abusive working environment.  In opposition, Plaintiff argues that her Amended Complaint "identifies numerous, pervasive, instances of members of the Board, individually and their agents or representatives, persistently seeking to physically intimidate, embarrass, falsely accuse, hinder and undermine the Plaintiff, her administration and its objectives, over a period of years." (Doc. 24, Opp'n Br. at p. 21).  Plaintiff contends these actions "unreasonably interfere[d]" with her work performance and her duties and privileges as superintendent.  (*Id.*). Plaintiff also argues that her constructive discharge claim is not based entirely on discriminatory conduct; it can also be based on Defendants' usurping her role as superintendent and depriving her of the duties and privileges of the office.  (*Id.*, p. 22).

We disagree with Defendants that there are no allegations supporting intentional discrimination against Plaintiff on the basis of race or sex, only allegations that happened to involve the topic of race when discussing School District matters. Defendants cite the following allegations: defendant Rawls demanded the hiring of minority teachers and administrators and the hiring of more black males because Plaintiff

is Caucasian, (Am. Compl. ¶ 34); Rawls observed that whites would listen to Plaintiff because she was white and she thinks like them, (*id.*, ¶ 35); Rawls voted against the hiring of Assistant Superintendent Taschner because he believed that an African-American should have gotten the position, (*id.* ¶ 39); and Rawls became angry and yelled at Plaintiff when he realized that the assistant principal he had voted against hiring was African-American.  (*Id.* ¶ 41).

However, as Defendants also note, Plaintiff also alleges Rawls "has publicly referred to Plaintiff as a 'bitch' and that the [District] is run by 'three white bitches.'"  (*Id.* ¶ 43).  Further, Rawls allegedly made the "three white bitches" statement in "one or more instances."  (*Id.* ¶ 59).

Nevertheless, we agree with Defendants that Plaintiff has failed to allege intentional discrimination.  All of these remarks were made by Rawls, only one member of the nine-member Board.  These allegations do not create the reasonable inference that the entire Board intended to discriminate on the basis of gender or race.[7]

We also agree with Defendants that Plaintiff fails to allege conduct on the part of Defendants that was severe and pervasive enough to sustain a constructive discharge claim.  The analysis depends in part on the severity of the conduct, meaning we must consider what Defendants are alleged to have done.  In this regard, we can divide the conduct into different types.  First, there were oral communications.  On or

---

[7] Plaintiff also alleged age discrimination in the Amended Complaint.  However, she failed to make any factual allegations to support this claim.  Further, she does not argue in opposition to the motion to dismiss that she was discriminated against on the basis of age.

about May 13, 2010, Rawls, verbally and physically threatened Plaintiff.  (Am. Compl. ¶ 38).  On April 9, 2013, Rawls violently slapped his hands on a table and yelled a string of profane references at Plaintiff.  (*Id.* ¶ 57).  On November 1, 2013, Bret Keisling, Rawls and Sussman's attorney in their lawsuit, yelled at Plaintiff.  (*Id.* ¶¶ 69 and 70).  (*Id.* ¶ 70).  On January 31, 2014, Rawls publicly demanded that Plaintiff resign.  (*Id.* ¶ 77).  On February 1, 2014, defendant Karl demanded her resignation, (*id.* ¶ 78), and then on February 4, 2014, signed a petition demanding her resignation.  (*Id.* ¶ 79).  Also, as noted above, Rawls "has publicly referred to Plaintiff as a 'bitch' and that the [District] is run by 'three white bitches.'"  (*Id.* ¶ 43).  Further, Rawls made the "three white bitches" statement in "one or more instances."  (*Id.* ¶ 59).

        If true, Rawls's physical threat and his three-white-bitches comments are deplorable.  However, the physical threat was only made once, and over four years before Plaintiff alleged she was constructively discharged, so it cannot be the basis of a constructive discharge claim.  The three-white-bitches comments, profane references and yelling were at most offensive utterances that are not severe or pervasive enough.[8] *See, e.g., Kimber-Anderson v. City of Newark*, 502 F. App'x 210, 214 (3d Cir. 2012)(nonprecedential)(sporadic use of abusive language not enough); *Barnett v. New Jersey Transit Corp.*, 573 F. App'x 239, 245 (3d Cir. 2014)(nonprecedential)(black female plaintiff's overhearing white supervisors refer to a black female executive as a "black bitch" not enough to create a hostile work environment).  Calling for Plaintiff's resignation

_____

        [8]  We assume that Keisling's conduct can be attributed to Defendants.

is supportive of a constructive discharge claim, *see Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159, 1161 (3d Cir. 1993), but not in these circumstances, when Plaintiff has a contract and the calls are being made by only two members of the nine-member Board.

Plaintiff also complains about Board conduct that allegedly interfered with her job responsibilities.  In 2013, Rawls interfered with the transfer of a high school gym teacher to an elementary school, even approaching the president of the teacher's union, stating the transfer should be 'grieved' by the district." (*Id.* ¶ 48).  The Board has violated Board policies so that: (1) the Board has dealt with complaints rather than allowing the administration to do so, (*id.* ¶ 93(a)); (2) the Board has not allowed the administration to hire for non-administrative positions between board meetings and without prior board approval, (*id.* ¶ 93(b)); (3) the Board has allowed and/or encouraged members of the public to speak about confidential personnel issues, display signs and disrupt speakers at public meetings, (*id.*); (4) on April 11, 2014, the Board and its solicitor ignored the superintendent's authority in hiring by meeting with Assistant Superintendent Taschner to post an employment position opening for a new position within the School District, (*id.*); and (5) as of April 15, 2014, the Board appointed a committee consisting of Defendants Rawls and Sussman, and Board President Dietrich to conduct interviews for hiring a District business manager.  (*Id.* ¶ 93(e)).  We do not consider this conduct, often separated by months, so regular and pervasive that it altered the conditions of Plaintiff's employment and created an abusive working environment.

Plaintiff has complained of other conduct.  On January 28, 2013, Rawls falsely accused Plaintiff of nepotism at a public meeting of the Board.  (*Id.* ¶ 50).  On February 15, 2013, Rawls visited the middle school and the high school without first notifying the administration.  (*Id.* ¶ 46).  On October 31, 2013, defendants Rawls and Sussman announced their intent to file a lawsuit against the Board and Plaintiff seeking to void the contract.  (*Id.* ¶ 63).  In October 2013, Sussman posted comments on Pennlive.com indicating that Plaintiff should get her resume ready as there were enough votes on the Board to fire her, (*id.* ¶¶ 64 and 66), and that Plaintiff could now be fired without any financial repercussions because she was responsible for the hiring of Shawn Sharkey.  (*Id.* ¶¶ 65 and 63).  In February 2014, Plaintiff's representative was ordered without a reason to leave an executive session of the board.  (*Id.* ¶ 81).  In early March 2014, defendants Karl and Sussman and Attorney Keisling held a community meeting with a local realtor attended by local media.  The meeting was supposed to show that Township housing values had dropped because the District was dysfunctional, but the meeting ended when the realtor stated that home prices had actually increased.  (*Id.* ¶ 84 and 85).  In March 2014, the Board started another investigation into the administration's handling of the Sharkey matter.  (*Id.* ¶ 91).

None of these allegations establish conduct so severe and pervasive that it altered the conditions of Plaintiff's employment and created an abusive working environment.  These conditions, even taken in conjunction with the other allegations

discussed above, were not such that a reasonable person would have found them so

intolerable she would have resigned her employment.  We will therefore dismiss Count I.

> B. *Count II: the Due Process Claim For Constructive*
> *Termination Without Notice Or a Hearing*

In Count II, Plaintiff makes a claim against the Board, Karl, Rawls and

Sussman for violation of due process under the Fourteenth Amendment on the ground

that her constructive termination was done without notice or a hearing.  It appears that

Count II also alleges that the constructive termination was intended to avoid giving her

the hearing to which she was entitled.

In moving to dismiss this count, Defendants do not contest that Plaintiff had

a property interest in her job under state law, meaning that she was entitled to the

protection of due process and, in ordinary circumstances, notice and a hearing before

she could be fired.  *See, e.g., Mayo v. Bangor Area Sch. Dist.*, No. 11-CV-6026, 2013 WL

3716533, at *8 and n.79 (E.D. Pa. July 16, 2013).  Instead, Defendants argue that Count

I of the original Complaint in this matter, the same constructive termination claim set forth

in Count I of the Amended Complaint, was Plaintiff's resignation from her job, thereby

relieving the Board from any obligation to give her a hearing.

If Plaintiff had resigned of her own free will, she is deemed to have

relinquished any property interest in her employment and cannot contend she was

deprived of any due process rights.  *See Leheny v. City of Pittsburgh*, 183 F.3d 220, 227

(3d Cir. 1999).  However, Count I of the original Complaint cannot be construed as a

voluntary resignation.  It alleges that Plaintiff was constructively discharged, that she was

forced out of her position by Defendant's conduct.  "A public employer obviously cannot

avoid its constitutional obligation to provide due process by the simply expedient of

forcing involuntary 'resignations.'" *Stone v. Univ. of Maryland Med. Sys. Corp.*, 855 F.2d

167, 173 (4th Cir. 1988).

Defendants recognize that a forced resignation does not defeat a due

process claim but argue that Plaintiff has failed to make any allegations that she was

forced to tender her resignation.  They rely on a five-factor test set forth in *Mayo*, *supra*:

> [T]he court should consider whether the employee (1) was
> presented with an alternative to resignation, (2) understood
> the nature of the choice she was given, (3) had a reasonable
> time to choose, (4) was permitted to select the effective date
> of her resignation, and (5) had the advice of counsel.
> *O'Connell,* 79 F. Supp. 2d 529, 533 (E.D. Pa. 1999)(Robreno,
> J).

*Mayo*, 2013 WL 3716533, at *10.  *See also Stone*, *supra*, 855 F.2d at 174 (listing the first

four factors).  Defendants assert that Plaintiff has failed to make any allegations

concerning the first four factors.  Additionally, they contend that the fifth factor favors a

finding that her resignation was voluntary as Plaintiff must have had advice of counsel.

They maintain her original Complaint, which they assert effectively sets forth her

resignation in Count I, was filed the day after her counsel received the April 16, 2014,

letter from the Board's attorney stating the Board's position that Plaintiff remained the

superintendent.  (Am. Compl. ¶¶ 95-97).

We disagree with Defendants that the *Mayo* five-factor analysis applies to this case. As *Mayo* and *Stone* exemplify, the analysis applies in fact situations where the employee actually resigned or resigned upon being given that option by the employer. Here, Plaintiff did not resign nor was she asked to resign.[9] It is therefore irrelevant that there does not seem to be allegations she could make, assuming she would have to make them at the pleading stage, that would satisfy the first four factors in *Mayo*.

Defendants contend that because resignation "is a prerequisite to a constructive discharge claim," the District "regarded Count I 'Constructive Termination' of Plaintiff's Complaint as her resignation." (Doc. 19, Br. in Supp. at p. 19). We need not determine whether resignation is a prerequisite to a constructive discharge claim, and Defendants cite no authority for that point, but even if Plaintiff resigned, formally or informally, or even if we construed the claim as being a resignation, Defendants could not rely on Count I to defeat Plaintiff's due process claim. As noted, the resignation must be voluntary, but a resignation resulting from an employee's belief that she had been constructively discharged was, from her point of view, coerced. Since Count I of the original Complaint does not establish a voluntary resignation, Defendants could not have relied on it to decide Plaintiff was not entitled to any due process rights.

We will therefore deny the motion to dismiss Count II.[10]

———————————

[9] We do not count public demands from certain Board members as a request to resign. It would have to be a legal act by the Board.

[10] This ruling does not contradict our decision that Plaintiff fails to state a constructive discharge claim in Count I. Unlike Count I, we deal in Count II with whether the allegation of a constructive discharge claim is sufficient to establish a voluntary resignation, not with the

-24-

### C.  *Count III: The Breach-of-Contract Claim*

In Count III, Plaintiff makes a breach-of-contract claim against the District alleging four breaches of her employment contract.  First, the Board breached the agreement by constructively terminating it.  (Am. Compl. ¶ 135).  Second, the Board breached the agreement by failing to give her notice and a hearing before termination. (*Id.* ¶ 137).  Third, the Board breached the agreement by terminating Plaintiff for cause without notice and hearing.  (*Id.* ¶ 138).  Fourth, the Board breached the agreement by terminating Plaintiff by a five-to-four vote rather than by the six-vote majority required by the agreement.  (*Id.* ¶ 139).

Defendants move to dismiss this claim on the following grounds.  First, under *Oak Ridge Constr. Co. v. Tolley*, 351 Pa. Super. Ct. 32, 38, 504 A.2d 1343, 1346 (1985), Plaintiff's filing of the lawsuit "clearly announced her termination" and was an anticipatory breach of the contract.  (Doc. 19, Br. in Supp. at p. 15).  Second, Plaintiff contradicts herself in claiming that she was constructively discharged at the same time she is arguing that the District breached the agreement by terminating her.  Third, the Board did not breach the agreement by accepting her resignation.

We reject all three arguments.  First, filing a lawsuit for a constructive discharge is not an anticipatory breach of contract; it is claim that the employer breached

───────────────────

merits of the claim itself.

the contract, not the employee.[11]  Next, there is no contradiction in claiming a

constructive discharge and a termination by the Board; a constructive discharge is a

termination.  Finally, we have already decided that Count I of the original Complaint was

not a resignation.

The motion to dismiss the breach-of-contract claim will be denied.

D.  *Count IV: The Claim for Tortious Interference With Contract*

In Count IV, Plaintiff makes a claim against Karl, Rawls, and Sussman for

tortious interference with contract.  Plaintiff alleges that Rawls and Sussman's lawsuit

seeking to void the contract was "intended to harm the contractual relationship between

Plaintiff and" the District.  (Am. Compl. ¶ 146).  The three Defendants intended to harm

the contractual relationship by their conduct and, while they were unsuccessful in

terminating the contract, they did prevent Plaintiff from performing her contractual duties

by creating a hostile threatening workplace and by "their efforts to undermine and

sabotage district image and administration performance."  (*Id.* ¶ 150).

Defendants present two arguments for dismissal of this claim.  First, parties

to a contract cannot be liable for tortious interference with the contract and Defendants as

Board members are parties to the employment agreement with Plaintiff.  Second, Plaintiff

has not adequately pled damages.

_____

[11]  However, our ruling above that Plaintiff was not constructively discharged may have an effect on Plaintiff's claim that the constructive discharge was a breach of contract.

It is true that parties to a contract cannot be found liable for tortiously interfering with that contract.  *Motise v. Parrish*, 297 F. App'x 149, 152 (3d Cir. 2008)(nonprecedential) *Kelly v. Bloom*, No. 11-CV-928, 2012 WL 425257, at *6 (M.D. Pa. Feb. 9, 2012).  However, the defendant Board members are not parties to the employment agreement.  As the agreement shows, it is the Board itself, more specifically the Board of School Directors, that is the party to the contract.  (Doc. 4, Am. Compl., Ex. B, contract of employment).  Further, Defendants cite no authority in support of their argument that individual members of the Board are parties to an employment agreement with a superintendent.

In regard to the second argument, we disagree with Defendants that Plaintiff has failed to adequately plead damages.  Thus, having found the arguments made against this claim deficient, we will allow it to proceed.

E.  *Count V: The Defamation Claim*

In Count V, Plaintiff makes a claim against Rawls for defamation based on his statement at the January 28, 2013, Board meeting that she had engaged in nepotism by hiring an unqualified niece.  Defendants move to dismiss this claim on the following grounds.  First, the statement was not defamatory when considered in context.  Second, Plaintiff fails to allege that the statement was publicized.  Third, and raised for the first time in their reply brief, the claim is barred by the one-year statute of limitations because

Rawls made his remarks on January 23, 2013, and this suit was filed on April 17, 2014, more than one year later.[12]

We need not deal with the first two arguments as we agree with Defendants that the claim is time-barred.  Pennsylvania has a one-year statute of limitations on libel or slander claims.  42 Pa. Con. Stat. Ann. § 5523(1).  "The statute of limitations for defamation claims is one year from the date of publication."  *McClenaghan v. Turi*, 567 F. App'x 150, 153 (3d Cir. 2014)(nonprecedential)(quoting *In re Philadelphia Newspapers, LLC*, 690 F.3d 161, 174 (3d Cir. 2012)).  Plaintiff's claim is therefore time-barred because it was filed more than a year after the date of publication, the date Rawls made his remarks.

In opposing this result, Plaintiff argues in her surreply brief that the defamation was republished on September 23, 2013, when the Board "issued an apology" for the false accusation of nepotism, to the employee who had been hired, not Plaintiff.  (Am. Compl. ¶¶ 52 and 163).  The statute of limitations therefore started to run again from that date, making her claim timely as her lawsuit was filed within a year of September 23, 2013.

Republication resets the statute of limitations.  *McClenaghan*, *supra*, 567 F. App'x at 154 (quoting *In re Philadelphia Newspapers, LLC*, 690 F.3d at 174).  However, Plaintiff's argument fails.  First, we must consider the context in which the remarks were

---

[12]  Defendants also argued for the first time in their reply brief that Plaintiff as a school superintendent is a public figure.  As a public figure, she had to allege the remarks were made with actual malice, and she failed to make these allegations in her Amended Complaint.

made, *Joseph v. Scranton Times L.P.*, 959 A.2d 322, 334 (Pa. Super Ct. 2008), and an

apology, even if it repeats the remarks, would not be capable of a defamatory meaning.

Second, for Rawls to be liable for the September 23, 2013, apology as a republication, he

would have to have been responsible for issuing the apology.  *McClenaghan*, *supra*, 567

F. App'x at 155 (the defendant must be responsible for the republication).  Here, Plaintiff

alleges the Board issued the apology.

The defamation claim will therefore be dismissed.

F.  *Count VI: The Claim for Intentional Infliction of Emotional Distress*

In Count VI, Plaintiff makes a claim against Karl and Rawls for intentional

infliction of emotional distress.  "The gravamen of the tort of intentional infliction of

emotional distress is that the conduct complained of must be of an 'extreme or

outrageous type.'"  *Cox v. Keystone Carbon Co.,* 861 F.2d 390, 395 (3d Cir.

1988)(quoted case omitted).  The conduct must be "so outrageous in character, and so

extreme in degree, as to go beyond all possible bounds of decency, and to be regarded

as atrocious, and utterly intolerable in a civilized society."  *Id.* (quoted case omitted).

Among other contentions, Defendants argue that Plaintiff has not alleged

conduct on the part of Karl and Rawls that is extreme or outrageous.  We agree.  We

have already reviewed these defendants' alleged conduct in connection with Plaintiff's

claim of constructive discharge.  The conduct simply does not rise to the level of

outrageousness required for this claim.  "[I]t is extremely rare to find conduct in the

employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." *Id.*

The claim for intentional infliction of emotional distress will therefore be dismissed.

### G. *Count VII: The Claim for Wrongful Use of Civil Proceedings*

In Count VII, Plaintiff makes a state-law claim against Rawls and Sussman for wrongful use of civil proceedings for their filing of *Rawls v. Susquehanna Township School Board of Directors*, No. 1:13-CV-2867 (M.D. Pa.), which included Dr. Kegerise as a defendant.  Rawls and Sussman discontinued their lawsuit without obtaining any relief from Dr. Kegerise.  (Am. Compl. ¶ 82).

Plaintiff's claim is made under Pennsylvania's Dragonetti Act.  42 Pa. Con. Stat. Ann. § 8351 *et seq.*

As the Third Circuit has stated:

> A Dragonetti Act claim for wrongful use of civil proceedings
> has five elements, that: (1) the current plaintiff prevailed in the
> underlying action; (2) the defendants acted in a grossly
> negligent manner or without probable cause; (3) the
> defendant had an improper purpose in pursuing the
> underlying action; (4) the proceedings terminated in favor of
> the plaintiff; and (5) the plaintiff was harmed.  [citations
> omitted].

*The Bobrick Corp. v. Santana Products, Inc.*, 422 F. App'x 84, 86 (3d Cir. 2011)(nonprecedential).

Defendants move to dismiss this claim, arguing that Plaintiff should be estopped from pursuing it.  They rely on Judge Jones's ruling in the other action that Rawls and Sussman did not pursue the litigation for an improper purpose.  The ruling was made in connection with Judge Jones's denial of Dr. Kegerise's motion under Fed. R. Civ. P. 11 seeking sanctions against Rawls and Sussman for having filed the lawsuit. See Doc. 33, ECF p. 14, memorandum and order filed August 28, 2014 in *Rawls v. Susquehanna Township School Board of Directors*, No. 1:13-CV-2867 (M.D. Pa.).  Under Rule 11, the nonmoving party must certify that the challenged filing was not submitted for an "improper purpose."  Fed. R. Civ. P. 11(b)(1).  The same language appears as one of the elements a plaintiff must prove on a Dragonetti claim, "that the defendant had an improper purpose in pursuing the underlying action."  *The Bobrick Corp., supra,* 422 F. App'x at 86.  Defendants thus argue that because Judge Jones decided that the lawsuit was not filed for an improper purpose, Plaintiff is estopped from pursuing a Dragonetti Act claim based on the lawsuit.

Defendants cite no authority in support of their argument.  The argument also seems to be incorrect.  In *Lightening Lube, Inc. v. Witco Corp.*, 4 F.3d 1153 (3d Cir. 1993), the Third Circuit stated that "the denial of a Rule 11 motion does not foreclose the assertion of a subsequent malicious prosecution suit."  *Id.* at 1196.  In support of this statement, the court cited *Cohen v. Lupo*, 927 F.2d 363 (8th Cir. 1991), and *Amwest Mortgage Corp. v. Grady*, 925 F.2d 1162 (9th Cir. 1991).  In *Cohen*, the Eighth Circuit held that res judicata (claim preclusion) did not bar an action for malicious prosecution by

a defendant in an earlier action who had been awarded Rule 11 monetary sanctions against the plaintiffs in the earlier action.  927 F.2d at 365.  In *Amwest Mortgage Corp.*, the Ninth Circuit ruled that denial of a Rule 11 motion did not justify enjoining a subsequent state-court action for malicious prosecution, a ruling made only after an analysis of Rule 11 law and the law of collateral estoppel (issue preclusion).  925 F.2d at 1164-65.

Defendants' argument is thus too sketchy to accept, especially since they have the burden as the moving party to show that Plaintiff's claim must fail.  We will therefore deny the motion to dismiss the claim for wrongful use of civil proceedings.

H.  *Count VIII: Family and Medical Leave Act Retaliation Claim*

In Count VIII, Plaintiff makes a claim against the District for retaliatory termination in violation of the Family and Medical Leave Act (FMLA), 29 U.S.C. §§ 2601-2654.  Defendants argue this claim fails because Plaintiff does not allege facts showing a FMLA retaliation claim.

FMLA regulations prohibit an employer from retaliating against an employee "for having exercised or attempted to exercise FMLA rights."  *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 256 (3d Cir. 2014)(quoting 29 C.F.R § 825.220(c)).  To succeed on such a claim, Plaintiff must show that "'(1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights."  *Id.* (quoting *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.,* 691 F.3d 294, 302 (3d Cir. 2012)).

-32-

We recite the allegations pertinent to the claim.  "Dr. Kegerise has been on leave from her position since March 24, 2014 due to medical reasons."  (Am. Compl. ¶¶ 94 and 179).  On April 16, 2014, Attorney Miller sent Plaintiff's counsel a letter stating that Plaintiff "is and remains the Superintendent . . . ."  (*Id.* ¶¶ 95 and 101; Doc. 4-14, ECF p. 1, Ex. N to Am. Compl.).  The letter also noted that Plaintiff had been sent forms necessary to apply for leave under the Family and Medical Leave Act to be completed "due to her qualifying condition."  (*Id.*; Am. Compl. ¶¶ 96 and 182).

On April 17, 2014, Plaintiff filed the original Complaint in this action.  (*Id.* ¶ 97).  "On April 21, 2014, the Board, as a last minute addition to the agenda halfway through the board meeting, voted to approve the acceptance of Plaintiff's "'Resignation.'" (*Id.* ¶¶ 100 and 183).  Plaintiff never tendered a resignation nor did she ever formally resign from her position.  (*Id.* ¶¶ 101 and 104).

Defendants argue in part that Plaintiff fails to allege a FMLA retaliation claim because Plaintiff fails to aver: (1) that she requested FMLA leave; (2) that there was a causal relationship between her termination (or her "resignation" as Defendants put it) and her FMLA rights; or (3) that she suffered an adverse action since she "voluntarily terminated her employment."  (Doc. 19, Br. in Supp. at pp. 27 and 28).

We reject the last two arguments.  Plaintiff fairly alleges she was sent the FMLA forms sometime in mid-April and that the Board accepted her "resignation" (quotation marks in original) on April 21, meaning that she was essentially discharged on that date.  This temporal proximity along with the alleged antagonism from Defendants

shows causation.  *See Budhun*, *supra*, 765 F.3d at 258.  Defendants are wrong to assert

that Plaintiff voluntarily resigned her employment, so the alleged discharge is a sufficient

adverse action.  *Id.* at 257 and n.6.

However, we agree with Defendants that Plaintiff has failed to allege the

first element of her claim, that she invoked her right to FMLA-qualifying leave.  Plaintiff

does allege that she had been sent the forms necessary to apply for FMLA leave and that

she qualified for FMLA leave.  However, she does not allege that she invoked her right to

FMLA leave before she was discharged.  In her opposition brief, Plaintiff does assert that

she was using her sick time before using her FMLA leave "with the knowledge of all

parties that a request for FMLA leave would follow."  (Doc. 24, Br. in Opp'n at p. 36).  She

also asserts in her brief that the Board accepted her "'resignation' knowing she would be

taking FMLA leave."  (*Id.*).  These assertions indicate that Plaintiff might be able to make

an allegation that would satisfy the first element of her claim.  However, they do not

appear in her pleading, only in her brief, so we cannot consider them.  *See In re*

*Burlington Coat Factories Sec. Litig.*, 114 F.2d 1410, 1424 (3d Cir. 1997)(district court

cannot rely on statements in a brief in deciding a Rule 12(b)(6) motion).  Thus, the FMLA

retaliation claim as it is presently pled must be dismissed.

I. *Count IX: the First Amendment Retaliation Claim*

In Count IX, Plaintiff makes a claim under the First Amendment against the

District, Karl, Rawls, and Sussman, alleging she was terminated in retaliation for the filing

of this lawsuit.

To plead a First Amendment retaliation claim, a plaintiff must allege: "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Thomas v. Independence Twp.*, 463 F.3d 285, 296 (3d Cir. 2006)(citing *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003)).

In part, Defendants make the following arguments against this claim. First, Plaintiff has failed to allege that she engaged in any constitutionally protected conduct. We disagree. Plaintiff has alleged the filing of the original Complaint in this matter as the constitutionally protected conduct. (Am. Compl. ¶ 187). Second, Plaintiff cannot satisfy the second element of the claim because by persisting in this lawsuit she has shown she has not been deterred from exercising her constitutional rights. We reject this argument. The test is not whether Plaintiff herself would have been deterred but whether a person of ordinary firmness would have been. *See Bistrian v. Levi,* 696 F.3d 352, 376 (3d Cir. 2012)(rejecting argument that placement in restricted housing was not an adverse action because the plaintiff had not been personally deterred in complaining about his placement, noting that the test, whether a person of ordinary firmness would have been deterred, was an objective inquiry). The motion to dismiss the First Amendment retaliation claim will therefore be denied.

We note that Defendants move to dismiss Plaintiff's tenth claim (also designated as Count IX), a claim under the Pennsylvania Constitution duplicating the retaliation claim under the First Amendment. Defendants move to dismiss this claim,

making one of the arguments they presented against the federal retaliation claim, that by

persisting in this lawsuit Plaintiff has shown she has not been deterred from exercising

her constitutional rights.  We reject this argument for the reason given above.

V.   *Whether leave to Amend the Dismissed Claims Should Be Granted*

We have dismissed some claims and allowed others to proceed.  We have

allowed the following claims to proceed: Count II, the due process claim for failing to give

Plaintiff notice and a hearing before terminating her; Count III, a breach-of-contract claim

for terminating her employment without the notice and hearing required by her

employment contract; Count IV, a claim for tortious interference with contract; Count VII,

a state-law claim for wrongful use of civil proceedings; Count IX, a First Amendment

retaliation claim; and the second Count IX (the tenth cause of action), a claim under the

Pennsylvania Constitution for termination in retaliation for the filing of this lawsuit.

We have decided to dismiss the following claims: Count I, the "constructive

termination" claim; Count V, a claim for defamation; Count VI, a claim for intentional

infliction of emotional distress; and Count VIII, a FMLA retaliation claim.

We must decide whether to allow Plaintiff an opportunity to amend the four

dismissed claims.  *See Travelers Indem. Co. v. Dammann & Co., Inc.*, 594 F.3d 238, 256

n.14 (3d Cir. 2010).  We need not allow amendment of a claim if it would be futile.  *Id.*

We conclude that additional allegations would not help Counts I, V or VI.  We will

therefore not allow amendment of these claims.  Based on our discussion above

concerning the statements in Plaintiff's opposition brief that would cure the defect in the

FMLA retaliation claim, we will grant Plaintiff an opportunity to amend the FMLA claim.

We will issue an appropriate order.

/s/William W. Caldwell
William W. Caldwell
United States District Judge

Date: January 7, 2015