**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SUSAN M. KEGERISE, | : | |
| **Plaintiff** | : | **No. 1:14-cv-0747** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| SUSQUEHANNA TOWNSHIP | : | |
| SCHOOL DISTRICT, <u>et al.</u>, | : | |
| **Defendants** | : | |

## MEMORANDUM

Before the Court is Defendants Susquehanna Township School District (the "District"), Carol L. Karl ("Karl"), Jesse Rawls, Sr. ("Rawls"), and Mark Y. Sussman ("Sussman")'s second motion for summary judgment.[1]  (Doc. No. 152.)  For the reasons that follow, the Court will grant in part and deny in part the motion.

## I.    BACKGROUND

### A.    Procedural Background

Plaintiff Susan M. Kegerise ("Plaintiff") initiated the above-captioned action on April 17, 2014, in connection with her previous employment as the superintendent of Susquehanna Township School District.  (Doc. No. 1.)  Plaintiff subsequently filed an amended complaint (Doc. No. 4), which Defendants moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) on July 15, 2014 (Doc. No. 12).  In a Memorandum and Order dated January 7, 2015, the Court granted in part and denied in part the motion to dismiss (Doc. Nos. 34, 35), dismissing Plaintiff's claims for constructive termination, defamation, and intentional infliction of emotional distress without leave to amend, and dismissing Plaintiff's FMLA retaliation claim with leave to amend (Doc. No. 35).  Plaintiff then filed a second amended complaint on January 28, 2015.

---

[1] The individual defendants are referred to collectively as "Defendants" herein.

(Doc. No. 36.)  By way of a joint stipulation filed on February 12, 2015 (Doc. No. 38), Plaintiff filed a third amended complaint on February 27, 2015 (Doc. No. 39), which sets forth nine (9) counts.[2]

Defendants filed a motion to dismiss certain counts in the third amended complaint on March 19, 2015 (Doc. No. 40), which the Court granted in part and denied in part (Doc. Nos. 43, 44).  Accordingly, the following eight (8) claims remain before the Court: a due process claim against Defendants under 42 U.S.C. § 1983 (Count II); a claim for breach of contract against the District (Count III); a claim for tortious interference with a contract against Karl, Rawls, and Sussman (Count IV); a claim for wrongful use of civil proceedings in violation of 42 Pa. C.S.A. § 8351, et seq. against Rawls and Sussman (Count VII); an FMLA retaliation claim against Defendants (Count VIII); a First Amendment retaliation claim against Defendants (Count IX); a retaliation claim under the Pennsylvania Constitution against Defendants (Count X); and a sex discrimination claim under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, et seq. against Defendants (Count XII).  Defendants move for summary judgment on each of the aforementioned counts.[3]  (Doc. No. 152.)  The Court heard oral argument on the motion on June 8, 2018, and having been fully briefed (Doc. Nos. 163, 167, 168), the motion is ripe for disposition.

B.    **Factual Background[4]**

---

[2] As noted in the third amended complaint, the Court dismissed Counts I, V, and VI in its January 7, 2015 Memorandum and Order granting in part and denying in part Defendants' motion to dismiss the first complaint.  (Doc. No. 39 at 22, 29.)

[3] The Court dismissed Count XI, which set forth a Title VII race discrimination claim, when it resolved the motion to dismiss the third amended complaint.  (Doc. Nos. 43, 44.)  Additionally, Defendants previously filed a motion for summary judgment (Doc. No. 110), which was rendered moot by their filing of the instant motion for summary judgment (Doc. No. 174).

[4] The following relevant facts of record are taken in part from Defendants' statement of material facts (Doc. No. 153), Plaintiff's "responses" to Defendant's statement of material facts (Doc. No.

### 1. Plaintiff's Employment with the District and Federal Lawsuit

Plaintiff's employment as the superintendent of the District began in January of 2010. (Doc. No. 153 ¶ 1.) Plaintiff, whose employment was governed by an employment agreement/contract with the District, signed a second employment agreement (the "employment agreement") with respect to her role as superintendent on May 7, 2013.[5] (Id. ¶ 2.) On April 17, 2014, Plaintiff filed the original complaint in this action against Defendants (Doc. No. 1). (Id. ¶ 16.) The complaint included, inter alia, a claim for "constructive termination." (Doc. No. 1.) Four days later, during a public meeting on April 21, 2014, the District's school board (the "Board") "took a vote . . . which [the Board] represented as a vote to accept [Plaintiff's] resignation." (Doc. No. 153 ¶ 21.) Defendants Karl, Rawls, and Sussman were members of the Board at this time.[6]

---

157), Plaintiff's "additional statement of facts" (Doc. No. 157), which is part of Plaintiff's responses to Defendant's statement of facts, and Defendants' "reply" to Plaintiff's additional statement of facts (Doc. 169). All of these documents contain specific citations to the record in each numbered paragraph. At times, Defendants have responded to a statement made by Plaintiff with: "denied as stated." In that event, the Court has cited the record underlying Plaintiff's statement. At other times, the parties have directly cited a portion of the record in their briefs and have not relied on one of their statements. In that event, the Court has also cited the record. Finally, in certain instances, the Court has cited the record to assist in resolving the summary judgment motion. Unless otherwise specified, the facts recited in this section are deemed undisputed.

[5] Plaintiff's employment agreement with the District is governed by Pennsylvania's school code, which promulgates requirements for, inter alia, the removal of superintendents. See 24 Pa. Stat. Ann. § 10-1080 (West 2012).

[6] In addition to filing the federal complaint that initiated the above-captioned action, Plaintiff brought a mandamus action in Pennsylvania state court, captioned as Kegerise v. DelGrande, No. 14-cv-3793 (Pa. Ct. Com. Pl. Dauphin Cty.), wherein the trial court ordered that she be reinstated as superintendent, and the Commonwealth Court affirmed. On April 26, 2018, the Supreme Court of Pennsylvania reversed, holding that Plaintiff was not entitled to mandamus relief. See Kegerise v. DelGrande, 22 MAP 2017. Following the state supreme court's decision, the parties submitted supplemental briefing as to the import of the state mandamus decision on the motion presently before this Court. (Doc. Nos. 179, 184.)

The District "memorialized the Board's April 21, 2014 vote by letter dated April 22, 2014" that was signed by John Dietrich ("Dietrich"), who was then serving as the president of the Board. (Id. ¶ 22.) During this process, the Board did not provide Plaintiff "with notice stating that she had been 'terminated.'"[7] (Id. ¶ 23.) Rather, the letter stated that the Board "voted to accept [Plaintiff's] resignation." (Id. ¶ 24.) Before voting to accept what it deemed Plaintiff's resignation, Dietrich "read a prepared statement on behalf of the Board" that reads as follows:

> The Board hereby emphatically disputes any and all claims raised by [Plaintiff] at United States Middle District Court at docket 1:14-cv-00747-WWC, which includes "constructive discharge," however, it recommends that the Board accept the resignation of [Plaintiff] that is implicit with the term "constructive discharge." Do I have a motion to approve her resignation, effective 4/17/2014 as stated?

(Doc. No. 157 ¶ 168.)

### 2. Plaintiff's Sick Leave

Prior to the aforementioned events, while Plaintiff was superintendent, she notified the District's business manager "that she was under a doctor's care and that she would be off of work" around March of 2014.[8] (Doc. No. 153 ¶ 3.) At the time Plaintiff "went out on sick leave, she had approximately 249 days of sick leave available to her." (Id. ¶ 13.) As superintendent, Plaintiff "did not personally develop and disseminate FMLA administrative regulations, but instead delegated that responsibility to [the District's] business manager" who, at that time, was

---

[7] In her response to Defendants' statement of material facts, Plaintiff does not provide a specific response to Defendants' statement that the "Board never provided [Plaintiff] with notice stating that she had been 'terminated.'" (Doc. No. 157 ¶ 23.) Accordingly, the Court deems this factual assertion undisputed.

[8] The parties dispute, however, the exact timing of Plaintiff's communication with the business manager, with Defendants asserting that Plaintiff conveyed this information to the business manager on March 24, 2014, and Plaintiff maintaining that emails between the Board members "show that they knew she was under a doctor's care and on sick leave before March 24, 2014." (Doc. No. 157 ¶ 3.)

Mike Frentz ("Frentz").  (Id. ¶¶ 10-11.)  Plaintiff was advised by Frentz that pursuant to the

District's own procedure, employees were required "to exhaust their sick leave prior to

requesting FMLA leave."  (Id. ¶ 12.)  Plaintiff maintains that she took sick leave due to

symptoms, "which included nose bleeds and cardiac issues" resulting from "job-related stress."[9]

(Id. ¶ 179.)

### 3.    Interactions Between Plaintiff, the School Board, and Other Individuals Affiliated with the District During Plaintiff's Time as Superintendent

#### i.    Undisputed Facts

As testified to by Kathy DelGrande ("DelGrande"), a Board member and school parent,

Plaintiff was "subjected to inappropriate treatment by Board members" while serving as

superintendent.  (Doc. No. 157 ¶ 85.)  Such treatment involved discussions by Board members

on Facebook that, according to Plaintiff, included discussions of Plaintiff and her performance as

superintendent in unfavorable terms.  (Id. ¶ 100.)  DelGrande testified that there were often

"staged" situations at public Board meetings (id. ¶ 102), which Plaintiff claims were orchestrated

so as to cause disruption and embarrass her.  Moreover, Karl testified that "the leaders of the

[F]acebook group" had discussed the idea of circulating a petition calling for Plaintiff's

resignation.  (Id. ¶ 105.)  In a similar vein, DelGrande testified that "Rawls, Dietrich, and

Sussman often walked into public meetings and knowingly told falsehoods to embarrass

Plaintiff," such as statements indicating that teachers were leaving the District "because of the

District [a]dministration."  (Id. ¶ 118.)  Additionally, Dr. Peter Sakol ("Sakol"), another Board

member, testified that Plaintiff was "screamed at" by Board members.  (Id. ¶ 122.)

---

[9] Defendants dispute this fact, stating that Plaintiff did not testify to that effect.  (Doc. No. 169 ¶ 179.)

## ii.    Disputed Facts[10]

Plaintiff also maintains that while she was superintendent, members of the Board attempted to embarrass her publicly on multiple occasions, and "publicly criticized Plaintiff for her [c]ontract," while refraining from doing so as to male superintendents who succeeded Plaintiff in her employment with the District.  (Id. ¶¶ 86-88.)  According to Plaintiff, such attempts to embarrass her included Rawls and Sussman's public announcement that they intended to file a complaint against the District and Plaintiff in federal court on October 31, 2013 (the "Rawls and Sussman lawsuit"), as well as Rawls and Sussman's "provid[ing] a copy of said [c]omplaint to the newspaper in which they criticized Plaintiff's contract."  (Id. ¶¶ 89-90.)  Plaintiff further claims that along with Karl and Sussman, Board members Dietrich and Clifton Edwards ("Edwards"), were "part of a small anti-Plaintiff Facebook group," through which negative information about Plaintiff was published (id. ¶ 100), and that while Plaintiff was superintendent, Board members "met with the leader of the Facebook group, Bonnie Finnerty, and arranged for people to show up at Board meetings to harass and embarrass [Plaintiff]."  (Id. ¶ 103.)

Further, Plaintiff states that she was told by the Board "not to speak at Board meetings," and that when she did speak, she was "cut off" from doing so, while male superintendents did not receive such treatment when they spoke at Board meetings.  (Id. ¶¶ 112-13.)  Also in the context of Board meetings, Plaintiff avers that the Board permitted "nonresidents to criticize Plaintiff . . . but did not allow it in the case of male superintendents," and also allowed "commentators critical of Plaintiff to go beyond the [three]-minute time limit," in

---

[10] As a threshold matter, the Court notes that the parties dispute several aspects of the factual backdrop of this section.  Accordingly, the Court does not deem the factual account provided within this section to be undisputed, but, rather, includes it for purposes of illustrating the disputed facts relevant for purposes of the motion that is currently before the Court.

addition to "refus[ing] to shut down inappropriate behaviors directed at Plaintiff." (Id. ¶¶ 114-16.)  According to Plaintiff, the "Board regularly interfered with [her] ability to carry out her professional responsibilities" as superintendent.  (Id. ¶ 121.)

### 4.    Plaintiff's Performance as Superintendent

Plaintiff's tenure as superintendent was reportedly marked by various developments within the District.  Specifically, while Plaintiff was the superintendent, the arrest record was reportedly lower than that during the tenure of a previous superintendent, David Volkman ("Superintendent Volkman" or "Volkman") (Doc. No. 122-6 at 42), and "township arrests" and "disruptions" allegedly decreased by eighty percent (Doc. No. 122-3 at 38).  DelGrande testified that, consequently, "[t]hings were much calmer in the school."  (Doc. No. 122-6 at 42:25.)  According to DelGrande, during her daughter's senior year, "there was not one phone call that the school was in lockdown" (id. at 43-44), and there were no reports of scheduling issues (id. at 43).  DelGrande testified further that during this time, there were no incidents of misuse of District funds (id. at 46), and unnecessary positions were eliminated within the District (Doc. No. 157 ¶ 74).[11]

### 5.    Previous Superintendents

Before Plaintiff became superintendent, Superintendent Volkman, a male, was employed as the District superintendent.  (Doc. No. 157 ¶ 44.)  During his tenure as superintendent, DelGrande's daughter was a tenth-grade student.  During this period, it was reported that there

---

[11] The record also includes testimony that during this time, an award-winning arts education program was developed to assist at-risk students in enrolling a top fashion school in New York City, a STEM program was initiated, students were able to observe surgical procedures at the Hershey Medical Center, and students were provided the opportunity to participate in a biofuels lab.  (Id. at 1-2.)  Further, the District's curriculum was reportedly reevaluated and the faculty received professional development guidance to assist them in improving their teaching.  (Id. at 2-3.)

were multiple instances during which the school was on lockdown. (Doc. No. 122-6 at 11.) In addition, fights between students allegedly occurred. (Id. at 11-13.) DelGrande and other parents reportedly met with Superintendent Volkman to discuss these occurrences at the high school (id. at 15), and Board members were also involved in these meetings (id. at 10-11).

Issues concerning student discipline were also reported during Superintendent Volkman's tenure with the District (id. at 12), and the parents' meetings continued as a result of dissatisfaction with his handling of these disciplinary issues (id.). Initially, according to DelGrande's testimony, parents of students thought that Superintendent Volkman considered the issues "overblown" (id. at 15), but when parents began meeting with him and providing him with information about certain incidents, the police were contacted and police officers were even assigned to the school lunchroom (id. at 15-16). Further, as expressed by DelGrande, Superintendent Volkman was not disciplined as a result of these occurrences at the school. (Id. at 16.)

In addition, while superintendent, Volkman hired a business manager named Matthew Malinowski ("Malinowski"), who, as allegedly revealed through an audit, purchased personal items with District funds. (Id. at 21-22.) In an April 13, 2010 letter from Plaintiff to Malinowski, Plaintiff listed items that should not have been charged to the District. (Doc. No. 121-1 at 85.)[12] Additionally, it was reported that during his tenure, former employees–some of whom were then deceased–were not removed from health-care enrollment lists, which presumably resulted in the loss of "an exorbitant amount" of funds. (Doc. No. 122-6 at 22-24.)

---

[12] Defendants object to this letter on the basis that it has not been authenticated. However, because the letter may be authenticated for use at trial, the Court may consider it for purposes of resolving the instant motion. See, e.g., Fraternal Order of Police, Lodge 1 v. City of Camden, 842 F.3d 231, 238 (3d Cir. 2016) ("In ruling on a motion for summary judgment, the [C]ourt need only determine if the nonmoving party can produce admissible evidence regarding a disputed issue of material fact at trial.").

In addition, DelGrande stated that while Mr. Volkman was the superintendent, the school administration did not apply for reimbursement for capital improvements under Pennsylvania's PlanCon program, which resulted in the loss of approximately seven million dollars. (Id. at 24-25, 28-29.)[13] Further, DelGrande stated that the Board neither took corrective action against Superintendent Volkman on any of these issues (id. at 24-25, 28-29), nor disciplined Malinowski for failing to remove former employees from the health-care list (id. at 24).

DelGrande also testified that under Superintendent Volkman's leadership, there were issues as to the adequacy of instruction of certain classes within the District. (Doc. No. 157 ¶ 54.) Further, DelGrande stated that some classes consisted of thirty-two to thirty-three students, while other classes had five or six students, and "[t]here were major scheduling issues at the high school." (Doc. No. 122-6 at 32-34.) She stated there were "major issues as far as [advanced placement] classes," including what the District offered in comparison to what other schools offered (id. at 38), and that while the Board was aware of the problems concerning class sizes, it reportedly did not discipline Superintendent Volkman as a result of such problems (id. at 34-35).

While Volkman was superintendent, the District was sued and eventually settled a lawsuit alleging sexual abuse of a female student by a driver's education teacher. (Id. at 39-40.) According to DelGrande, the Board attempted to portray the incident as not having occurred (id. at 39), and in her opinion, Superintendent Volkman "tried to cover it up" (id. at 40). Additionally, during his tenure, non-residents were reportedly permitted to register as students and attend school within the District. (Doc. No. 157 ¶ 62.) DelGrande testified that the Board did not discipline Superintendent Volkman for permitting this practice, although it was aware that he was doing so. (Doc. No. 122-6 at 39.) Further, he allegedly did not experience the same

---

[13] Defendants, however, dispute that DelGrande testified that this occurred during Superintendent Volkman's tenure. (Doc. No. 169 ¶ 52.)

criticisms and behavior from Board members that Plaintiff claims she experienced.  (Doc. No. 122-9 at 24.)

### 6. Subsequent Superintendents

Following the end of Plaintiff's tenure as superintendent on April 21, 2014, all of the interim superintendents –Jeffrey Miller ("Miller"), Richard Daubert ("Daubert"), and Todd Kline ("Kline") – were male.  (Doc. No. 157 ¶ 45.)  Under the leadership of these superintendents, according to certain deposition testimony, the following events occurred.  DelGrande testified that under Miller and Daubert, there was an increase in the number of incidents reported to the police at the high school, relative to those reported during Plaintiff's tenure.  (Doc. No. 122-7 at 4.)  Sakol testified that he did not think that student discipline improved under the superintendents after Plaintiff (Doc. No. 122-9 at 25), and district finances reportedly worsened (Doc. No. 122-7 at 4).[14]  In response to a question about educational quality, DelGrande said, "[w]ell, the students weren't getting what they had received before."  (Id. at 6.)  Further, according to DelGrande, scheduling issues and other administrative concerns reappeared.  (Doc. No. 157 ¶¶ 81, 82.)  In addition, Miller allegedly signed a $40,000 contract without the requisite approval from the Board, but was not disciplined by the Board for doing so.  (Id. ¶ 83.)  Further, Miller and Daubert reportedly were not subjected to the same criticism and conduct regarding disciplinary issues that Plaintiff reports to have experienced.  (Doc. No. 122-9 at 26-27.)

## II.     LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is

---

[14] However, Defendants note that DelGrande also testified that "the district hired numerous teachers" and "tripled the special education department."  (Doc. No. 122-7 at 5.)

material if it might affect the outcome of the suit under the applicable law, and it is genuine only if there is a sufficient evidentiary basis for allowing a reasonable factfinder to return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). At summary judgment, the inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law. Id. at 251-52. In making this determination, a court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas. Co., 364 F.3d 135, 145-46 (3d Cir. 2007). Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Grp. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is warranted. Celotex, 477 US. at 322. With respect to the sufficiency of the evidence that the non-moving party must provide, a court should grant a motion for summary judgment when the non-movant's evidence is merely colorable, conclusory, or speculative. Anderson, 477 U.S. at 249-50. There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts. Id. at 252; see also Matsushita Elec. Indus. Co. v. Mem'l Hosp., 192 F. 3d 378, 387 (3d Cir. 1999).

### III. DISCUSSION

#### A. Qualified Immunity

Defendants assert that they are entitled to qualified immunity as to Counts II (due process violation), VIII (FMLA retaliation), IX (First Amendment retaliation), X (retaliation under the Pennsylvania constitution), and XII (sex discrimination under Title VII) of the third amended complaint. (Doc. No. 163 at 30-31.) As a threshold matter, the Court first addresses the applicability of qualified immunity infra.

#### 1. Legal Standard

The doctrine of qualified immunity provides "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (articulating concept of qualified immunity). In addition, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987).

#### 2. Applicability of Qualified Immunity to Individual Defendants

Defendants argue that in this case, they decided "simply to accept the verified allegations in [Plaintiff's] original [c]omplaint as the resignation of her position," and that, "[w]hether this was a correct position, a mistake of law, a mistake of fact, or both, immunity should still attach to each of the members of the Board, including the individual Defendants." (Doc. No. 163 at 33.) According to Defendants, "the Board reasonably believed, and still believes that its conduct complied with the law," and "it cannot be said that [Plaintiff's] due process and the constitutional rights alleged in her [t]hird [a]mended [c]omplaint were 'clearly established.'" (Id. at 34.)

Conversely, Plaintiff asserts that qualified immunity is inapplicable because it "is only a defense to actions seeking to hold defendants personally liable for their actions taken under the color of law" that "does not apply to official capacity actions, which require a showing that the individual acted in accordance with a policy or custom of the governmental entity, and the policy was the 'driving force' behind the alleged constitutional or statutory violation." (Doc. No. 167 at 32.)

The Court concludes that under the standard articulated above, qualified immunity does not apply to Karl, Rawls, and Sussman. As an initial matter, the Court notes that the caption of the third amended complaint indicates that Plaintiff is suing the aforementioned Defendants in both their individual and official capacities (Doc. No. 39), and, therefore, qualified immunity would apply to them to the extent that they are sued in their individual capacities. However, Plaintiff appears to disclaim any intent that she is suing Karl, Rawls, and Sussman in their individual capacities, but rather, asserts that she has set forth claims against them only in their official capacities. In light of the fact that Plaintiff has asserted claims against these Defendants in their official capacities, the Court finds that qualified immunity is inapposite, for official capacity suits are "only another way of pleading an action against an entity of which an officer is an agent." See Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 690 n.55 (1978). Additionally, in the context of an official capacity suit, the real party in interest is the entity of which the officer being sued is an agent. See Kentucky v. Graham, 473 U.S. 159, 166 (1985). Thus, by suing the aforementioned individual Board members in their official capacities, Plaintiff is, in actuality, suing the District, rendering qualified immunity inapplicable. See Barna v. Bd. of Sch. Dirs., 877 F.3d 136, 145 (3d Cir. 2017) (reasoning that school board was not entitled to qualified immunity). Accordingly, the Court concludes that qualified immunity is inapplicable to the claims against Karl, Rawls, and Sussman.

**B.     Due Process (Count II)**

In Count II of the third amended complaint, Plaintiff alleges a violation of due process under 42 U.S.C. § 1983 on the basis that "[p]ursuant to the [Pennsylvania] School Code, the only mechanism for the removal of an administrator is a due process hearing with prior notice."  (Doc. No. 39 ¶ 126) (citing 24 Pa. Stat. Ann. § 10-1080 (West 2012)).  According to Plaintiff, Defendants deprived her of her constitutionally-protected interest in her employment contract without due process by "terminating [her] without written notice of alleged misconduct and failing to provide a fair and impartial adjudication hearing."  (Id. ¶ 28.)

**1.     Legal Standard**

"The essential elements of due process are notice and an opportunity to be heard in a meaningful manner and at a meaningful time under the circumstances."  Mosley v. City of Pittsburgh Pub. Sch. Dist., 702 F. Supp. 2d 561, 574 (W.D. Pa. 2010) (citing Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985)).  Further, "[t]here are only two circumstances in which an employee's resignation will be deemed involuntary for due process purposes: (1) when the employer forces the resignation or retirement by coercion or duress, or (2) when the employer obtained the resignation or retirement by deceiving or misrepresenting a material fact to the employee."  Rife v. Borough of Dauphin, 647 F. Supp. 2d 431, 450-51 (M.D. Pa. 2009) (internal quotation marks omitted) (quoting Leheny v. City of Pittsburgh, 183 F.3d 22, 228 (3d Cir. 1999)).

**2.     Plaintiff's Due Process Claim**

Defendants argue that as to this count, Plaintiff cannot establish a claim of a due process violation because she resigned from her position as superintendent, asserting that when an employee leaves her employment based on her own free will, that employee "is deemed to have

relinquished [her] property interest in [her] continued employment for the government, and cannot contend that [she] was deprived [her] due process rights." (Doc. No. 163 at 4) (alterations in original). Stating that Plaintiff "implicitly tendered her resignation when she filed her original [c]omplaint and alleged that she was constructively discharged" and positing that an employee's resignation is a prerequisite to a claim for constructive discharge, Defendants argue primarily that Plaintiff could not have been constructively discharged – or, in other words, have involuntarily left her position – because her original complaint, wherein she alleged constructive discharge, contemplated her resignation. (Id. at 4-8.)

On January 7, 2015, in ruling on Defendants' motion to dismiss the first complaint pursuant to Rule 12(b)(6), Judge Caldwell explicitly rejected the concept that Plaintiff's filing of a complaint that includes an allegation of constructive discharge – of which actual resignation is an element – could constitute a resignation and thus preclude any due process claim. (Doc. No. 43 at 24.) In opposing Defendants' summary judgment motion, Plaintiff, therefore, maintains that "this Court already considered and rejected Defendants' argument that Plaintiff resigned by filing a claim for constructive discharge," and "[a]s their argument was a legal rather than a factual one, Defendants should not be allowed to re-litigate it except on appeal." (Doc. No. 167 at 4.) Additionally, Plaintiff maintains that in her original complaint, she did not allege that she resigned, nor did she "submit a formal resignation in verbal or written form," and she also "continued to make herself available to the Board even though she was on sick leave." (Id.) Plaintiff further supports her argument by stating that she could have submitted a formal, written letter of resignation, but chose not to do so, as she did not resign. (Id. at 4-5.)

Addressing the Pennsylvania Supreme Court's ruling on Plaintiff's mandamus action and its import as to the instant motion, Defendants urge the Court to look to the Supreme Court's

reasoning that "[i]n order to maintain a claim of constructive discharge, an employee first must demonstrate that he or she actually resigned." (Doc. No. 179 at 4.) Specifically, Defendants highlight that the supreme court relied on certain factors in concluding that Plaintiff resigned, including: (1) the timing of Plaintiff's federal complaint; (2) the fact that Plaintiff filed a verified complaint that included an allegation of constructive discharge and sought damages related to her salary and future salary; (3) the fact that Plaintiff was involved in drafting her employment agreement that contemplated "constructive termination"; (4) Plaintiff's mandamus testimony indicating she understood the meaning of the term "constructive discharge" and that it carried the same definition in both her state and federal actions; and (5) "[t]he fact that [Plaintiff] had also conceded that resignation was a required element of constructive discharge." (Id. at 5-6.) Further, Defendants assert that in construing the Pennsylvania School Code, the Supreme Court ruled that Plaintiff "was not entitled to any due process or a hearing prior to the School Board's decision to accept her resignation" (id. at 6), which thus undermines Plaintiff's entire due process claim. (Id. at 7) (stating that "[t]he sole vehicle" for Plaintiff's due process claim has been deemed inapplicable by the state supreme court).

In her supplemental brief addressing the recent decision in her mandamus action in the context of the motion that is before this Court, Plaintiff does not address directly the aforementioned arguments made by Defendants. Rather, Plaintiff argues that the Supreme Court's ruling was legally deficient and, thus, should be disregarded by this Court. First, Plaintiff asserts that the state court, inter alia, made certain improper factual determinations unsupported by the record, thus "overturn[ing] findings of fact made by the trial court," and disregarded "evidence showing that Plaintiff did not intend to relinquish her position and Defendants knew it." (Id. at 3-17.) Second, Plaintiff argues that in discussing the relationship

between the element of actual resignation and the broader concept of constructive discharge, the Pennsylvania Supreme Court interpreted federal law on constructive discharge in such a way that produces the anomalous result of penalizing Plaintiff for initiating a federal action in order to protect her employment.  (Id. at 18-20.)

The Court concludes that summary judgment in favor of Defendants is warranted as to Plaintiff's due process claim.  As Defendants note, the basis for Plaintiff's due process claim as alleged in Count II of the third amended complaint is the Pennsylvania School Code, which the Supreme Court of Pennsylvania has interpreted as not bestowing upon Plaintiff a right to notice and a hearing.  While Plaintiff may disagree with the decision of the Commonwealth's highest court regarding her mandamus action, this Court is ultimately bound by the Pennsylvania Supreme Court's interpretation of Pennsylvania state law, including its analysis of the School Code.[15]  As a result, because as a matter of law the District was not required to provide Plaintiff with notice and a hearing in conjunction with the end of her employment with the District, no reasonable factfinder could conclude that Plaintiff is entitled to relief on her due process claim.  Accordingly, Defendants' motion for summary judgment will be granted as to Count II of the third amended complaint.

## C.    Breach of Contract (Count III)

In Count III of the third amended complaint, Plaintiff sets forth a claim for breach of contract against the District.  (Doc. No. 39 at 26.)  Plaintiff claims that pursuant to her employment contract, which "provides for notice and [a] hearing prior to a vote on termination for misconduct," the District "violated the explicit mandates of the employment contract . . . by

---

[15] See, e.g., Terra Nova Ins. Co., Ltd. v. North Carolina Ted, Inc., 715 F. Supp. 688, 692 n.4 (E.D. Pa. 1989) ("When a federal court is required to interpret or apply state law, it must consider and accept the decisions of the state's highest court as the ultimate authority regarding state law.").

terminating Plaintiff for cause without written notice . . . and failing to provide a fair and impartial adjudication hearing." (Id. ¶¶ 135-36.)

### 1. Legal Standard

A claim for breach of contract under Pennsylvania law includes the following elements: "(1) the existence of a contract; (2) a breach of a duty imposed by the contract; and (3) damages." See Burton v. Teleflex, Inc., 707 F.3d 417, 431 (3d Cir. 2013) (citing Braun v. Wal-Mart Stores, Inc., 24 A.3d 875, 896 (Pa. Super. Ct. 2011)). Additionally, when "a dispute of material fact exists as to whether [an employee-plaintiff] resigned or was terminated," summary judgment is improper. See id. (concluding district court improperly granted summary judgment to employer on breach of contract claim).

### 2. Plaintiff's Breach of Contract Claim

Defendants argue that Plaintiff "cannot have it both ways in arguing that she was constructively discharged and also that [the District] breached her [e]mployment [a]greement in terminating her employment." (Doc. No. 163 at 14.) To that end, Defendants assert that under Pennsylvania law, "where one party to a contract . . . [causes] the failure to perform by another party, that first party cannot advantageously use his or her own fault as an exit of escape for performance of contractual obligations." (Id. at 13) (citing Rainier v. Champion Container Co., 294 F.2d 96 (3d Cir. 1961)).

In opposition, Plaintiff asserts that Defendants' argument is "entirely premised on their claim that Plaintiff resigned by filing for constructive termination – a claim that has already been rejected by this Court." (Doc. No. 167 at 18.) Further, Plaintiff states that "Defendants also breached Plaintiff's contract by failing to abide by the provisions designed to protect [Plaintiff] from just the sort of treatment that is detailed in Plaintiff's [s]tatement of [f]acts." (Id.)

In their supplemental brief in further support of their motion, Defendants cite "[t]he Pennsylvania Supreme Court's finding that [Plaintiff] resigned" and note that Plaintiff's "argument [as] to continued employment under her contract was founded on her singular belief" that she was entitled to notice and a hearing prior to any vote as to the status of her employment. (Doc. No. 179 at 8.) According to Defendants, Plaintiff's breach of contract claim is ultimately "founded on her mistaken contention that she was entitled to continue as an employee while maintaining her constructive discharge claim," and the ultimate disposition of her mandamus action further highlights the flawed nature of this belief.[16] (Id.)

The Court concludes that summary judgment in favor of Defendants is warranted as to Plaintiff's claim for breach of contract. As explained above, a claim for breach of contract is fundamentally a matter of state law. In this instance, Plaintiff maintains that she did not resign, but rather, that she left her employment with the District involuntarily, a contention that would typically preclude the entry of summary judgment on the basis of the existence of a genuine dispute of material fact.[17] The state supreme court, however, specifically addressed the scenario that Plaintiff alleges constituted a breach of contract, concluding that "[w]e cannot impose a duty upon the Board to provide notice and a hearing to a resigning superintendent absent any language in [the School Code] that directs us to do so." See Kegerise v. DelGrande, 22 MAP 2017, at 12. In examining the School Code – a product of Pennsylvania law – the court

---

[16] Plaintiff does not appear to address specifically the impact of the state court mandamus ruling on her breach of contract claim. As explained supra, the essence of the arguments presented by Plaintiff in her supplemental brief is that the Pennsylvania Supreme Court's decision denying her mandamus relief was legally deficient. Therefore, as it relates to Plaintiff's breach of contract claim, Plaintiff's supplemental briefing does not provide any additional argument as to the impact of the state court mandamus action on her claim.

[17] See, e.g., Burton v. Teleflex, Inc., 707 F.3d 417, 431 (3d Cir. 2013) (reasoning that "[b]ecause a dispute of material fact exists as to whether [the plaintiff] resigned or was terminated, summary judgment was inappropriately granted on her breach of contract claim").

explicitly stated that, based on its conclusion that Plaintiff resigned, the District did not owe any type of duty to Plaintiff to provide her with notice and a hearing. Plaintiff, therefore, cannot meet her burden in establishing sufficient facts to survive the motion for summary judgment on this claim, as she cannot establish the existence of the duty she alleges was breached. Accordingly, Defendants' motion for summary judgment will be granted as to Count III of the third amended complaint.

### D. Tortious Interference with a Contract (Count IV)

Count IV of the third amended complaint sets forth a claim for tortious interference with a contract against Karl, Rawls, and Sussman on the basis that Karl, Rawls, and Sussman were third parties to Plaintiff's employment contract with the District, and that by bringing a separate lawsuit against Plaintiff that was ultimately withdrawn (the "Rawls and Sussman lawsuit"), Rawls and Sussman "intended to harm the contractual relationship between Plaintiff and [the District]." (Doc. No. 39 ¶¶ 141-43.)

### 1. Legal Standard

Under Pennsylvania law, to establish tortious interference with an existing or prospective contract, a plaintiff must demonstrate the existence of the following four elements:

> (1) the existence of a contractual relationship or prospective contractual relationship between the plaintiff and another party; (2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship or preventing the relationship from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage as a result of defendant's conduct.

Synthes, Inc. v. Emerge Med., Inc., 25 F. Supp. 3d 617, 727 (E.D. Pa. 2014) (citing Phillips v. Selig, 959 A.2d 420, 428-29 (Pa. Super. Ct. 2008); BP Envtl. Servs., Inc. v. Republic Servs., Inc., 946 F. Supp. 2d 402, 407 (E.D. Pa. 2013); RESTATEMENT (SECOND) OF TORTS, § 766-766B (1979)).

## 2.    Plaintiff's Tortious Interference Claim

Defendants argue that they are entitled to summary judgment as to Plaintiff's tortious

interference claim because Plaintiff "has failed to adduce any evidence of purposeful action . . .

specifically intended to harm [Plaintiff's] contractual relationship" and Plaintiff has not proffered

evidence of "actual legal damage as a result of the alleged conduct."  (Doc. No. 163 at 16.)

 In opposition, Plaintiff asserts that neither of the aforementioned arguments has merit, citing her

statement of material facts for the proposition that "Rawls and Sussman reached out to a

Pennlive reporter" to announce their intention to file the subject lawsuit, "waited twenty-five

(25) days to file the [c]omplaint, which contained a number of meritless claims"; amended the

complaint by, <u>inter alia</u>, removing the District as a Defendant; and subsequently withdrawing the

claim after receiving a letter from the District's solicitor "detailing the frivolous nature of the

[c]omplaint and threatening sanctions."  (Doc. No. 167 at 19.)  Further, Plaintiff points to Rawls

and Sussman's statement–made at the time they withdrew the complaint– that "while we are

confident the courts would have found in our favor, the reasons for filing this action have been

corrected as a result of community and media interest in this case and recent events."  (<u>Id.</u>)

Plaintiff argues that such a statement amounts to an admission that the lawsuit was filed for an

improper purpose.  (<u>Id.</u>)  According to Plaintiff, therefore, "a reasonable trier of fact could find

that . . . the actions and statements of Defendants were designed to and did, in fact, convince

members of the Board to violate Plaintiff's [c]ontract."  (<u>Id.</u> at 20.)

The Court concludes that Defendants have not met their burden in demonstrating that

summary judgment is warranted as to Plaintiff's tortious interference claim.  Although Plaintiff

refers to the Rawls and Sussman lawsuit in support of this claim, and Defendants maintain that

the initiation of this lawsuit cannot establish that Rawls and Sussman caused the entire Board to

terminate Plaintiff's employment agreement with the District, the Court notes that Plaintiff has alleged several additional facts that could lead a reasonable factfinder to conclude that the aforementioned elements for a tortious interference claim have been met. For example, Plaintiff's additional statement of facts includes, inter alia, the following factual assertions:

> 118. In violation of Board policy, Board members Rawls, Dietrich and Sussman often walked into public meetings and knowingly told falsehoods to embarrass Plaintiff such as [that] teachers are leaving [the District] because of the District Administration.
>
> . . .
>
> 124. Board members Rawls, Sussman, Karl and Dietrich sought disruptions during Board meetings to discredit Plaintiff.
>
> . . .
>
> 126. Defendant Rawls screamed at Plaintiff on multiple occasions and banged his fist on the table.
>
> . . .
>
> 139. Defendant Sussman constantly (i.e. daily even hourly) reported trivial and nonexistent issues to Plaintiff and demanded immediate[] action.
>
> . . .
>
> 140. Defendant Sussman . . . banged [his] fist on the table to intimidate Plaintiff.
>
> . . .
>
> 147. Defendant Sussman sent an email to a Jewish community group containing falsehoods about [the] District Administration and Plaintiff.

(Doc. No. 157 ¶¶ 118, 124, 126, 139, 140, 147.)[18] Accordingly, Plaintiff has put forth evidence beyond that pertaining solely to the Rawls and Sussman lawsuit that would permit a reasonable factfinder to conclude that the collective actions of the individual board members were taken

---

[18] Although Defendants dispute these facts, the Court construes the instant factual disputes in favor of Plaintiff, the non-moving party, for purposes of its summary judgment analysis.

with the purpose of interfering with Plaintiff's employment agreement with the District.  See, e.g., Gerstadt v. Lehigh Valley Infectious Disease Specialists, No. 08-cv-4869, 2009 WL 839092, at *4 (E.D. Pa. Mar. 30, 2009) (stating that for purposes of a tortious interference claim under Pennsylvania law, courts employ a case-specific analysis that examines, inter alia, "the nature of the actor's conduct" and "the actor's motive" when determining the "[p]resence of wrongful conduct").[19]  Therefore, Defendants' motion for summary judgment will be denied as to Count IV of the third amended complaint.

### E.  Wrongful Use of Civil Proceedings/Dragonetti Act Claim (Count VII)

In Count VII of the third amended complaint, Plaintiff sets forth a claim of a violation of 42 Pa. C.S.A. § 8351, et seq., also referred to as the Dragonetti Act, against Rawls and Sussman in relation to the Rawls and Sussman lawsuit.

### 1.  Legal Standard

The Dragonetti Act, which pertains to the wrongful use of civil proceedings, reads in relevant part as follows:

> (a) Elements of action. −A person who takes part in the procurement, initiation or continuation of civil proceedings against another is subject to liability to the other for wrongful use of civil proceedings:
> (1) he acts in a grossly negligent manner or without probable cause and primarily for a purpose other than that of securing the proper discovery, joinder of parties or adjudication of the claim in which the proceedings are based; and
> (2) the proceedings have terminated in favor of the person against whom they are brought.

42 Pa. C.S.A. § 8351, et seq. (emphasis added).

---

[19] Additionally, the district court in Gerstadt emphasized the importance of the Plaintiff's allegations of sex discrimination in discussing the existence of improper conduct on the part of the defendants.  See Gerstadt, 2009 WL 839092, at *5.

In addition, as explained by the United States Court of Appeals for the Third Circuit in a relatively recent decision summarizing applicable law on this topic, "[g]enerally, . . . whether a withdrawal or abandonment constitutes a favorable, final termination of the case against who the proceedings are brought initially depends on the circumstances under which the proceedings are withdrawn." See Hyldahl v. Denlinger, 661 F. App'x 167, 171 (3d Cir. 2016) (citing D'Elia v. Folino, 933 A.2d 117, 122 (Pa. Super. Ct. 2007)). Further, "[a] voluntary withdrawal of civil proceedings does not constitute a favorable termination unless the withdrawal was "tantamount to the unbidden abandonment of a claim brought in bad faith." Id. (citing Majorsky v. Douglas, 58 A.3d 1250, 1270 (Pa. Super. Ct. 2012)). "Thus, Pennsylvania courts have concluded that a withdrawal of proceedings is a favorable termination when the withdrawal occurred 'on the eve of trial' and the circumstances indicated that the withdrawal was a 'last-second dismissal in the face of imminent defeat.'" Id. (quoting Bannar v. Miller, 701 A.2d 242, 245, 248 (Pa. Super. Ct. 1997); Majorsky, 58 A.3d at 1269-70).

## 2. Plaintiff's Dragonetti Act Claim

Defendants argue that they are entitled to summary judgment as to this claim "because there are no issues of material fact as to whether Defendants acted in a grossly negligent manner or without probable cause and primarily for an improper purpose." (Doc. No. 163 at 18.) In opposition, Plaintiff refers to her statement of material facts, claiming that Rawls, Sussman, and their attorney, Bret Kiesling ("Kiesling"), "whose wife . . . was a member of an anti-Plaintiff Facebook group[,]" contacted a reporter for Pennlive about filing a complaint against Plaintiff and the District and provided a copy of said complaint "to the reporter several days before [the Board's] election day and twenty-five (25) days before they filed it." (Doc. No. 167 at 21.) Further, according to Plaintiff, the complaint – which was subsequently amended so as to leave

Plaintiff as the only defendant – consisted of allegations related to plaintiff's employment contract and efforts by Plaintiff's former legal counsel to prevent Rawls and Sussman "from continuing to harass, embarrass, and otherwise interfere with Plaintiff."  (Id. at 22.)  Plaintiff also cites the subsequent withdrawal of the lawsuit, referring to Rawls and Sussman's alleged statement that the reasons behind the suit "have been corrected" due to "community and media interest" as indicative of what Plaintiff claims was an improper purpose for initiating the lawsuit. (Id.)

The Court concludes that Plaintiff has proffered sufficient evidence to survive Defendants' motion for summary judgment as to this count.  As mentioned in the Court's discussion of Plaintiff's tortious interference claim, Plaintiff has demonstrated a genuine dispute of material fact as to certain improper conduct on the part of the Board members.  Further, although Rawls and Sussman withdrew the lawsuit at a relatively early stage in the litigation, as the lawsuit was allegedly filed on November 25, 2013 and withdrawn on March 4, 2014 (Doc. No. 39 ¶¶ 74, 82) and did not occur "on the eve of trial" or under circumstances indicating the withdrawal was a "last-second dismissal in the face of imminent defeat," see Hyldahl, 661 F. App'x at 171 (citing Bannar, 701 A.2d at 245, 248), the circumstances surrounding the withdrawal of the Rawls and Sussman lawsuit demonstrate the existence of a genuine dispute of material fact as to Plaintiff's Dragonetti Act claim.  Here, where there is evidence that the withdrawal of the lawsuit was followed by a pronouncement indicating that the lawsuit was initiated for a purpose other than to seek some form of legal recourse against Plaintiff, a reasonable factfinder could conclude that the litigation was terminated in Plaintiff's favor on the basis that the withdrawal represented the "abandonment of a claim brought in bad faith."  See id.

at 171 (citing <u>Majorsky</u>, 58 A.3d at 1270).  Accordingly, Defendants' motion for summary judgment will be denied as to Count VII of the third amended complaint.

### F.      FMLA Retaliation (Count VIII)

In Count VIII of the third amended complaint, Plaintiff asserts a claim against the District for a violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, <u>et seq.</u>, alleging that she "was on leave from her position [as superintendent] for health related reasons beginning on March 24, 2014[,]" and that the District had subsequently "sent Plaintiff [FMLA] [p]aperwork for completion due to her qualifying condition."  (Doc. No. 39 ¶¶ 160, 162, 163.) Plaintiff also alleges that even though it was "known to all parties that Plaintiff would exhaust [her] sick leave prior to taking FMLA leave time," the Board terminated her on April 21, 2014 in construing her federal lawsuit as a resignation.  (<u>Id.</u> ¶¶ 164-65.)  According to Plaintiff, Defendants terminated her "knowing she would soon be taking FMLA leave."  (<u>Id.</u> ¶ 167.)

#### 1.      Legal Standard

FMLA regulations prohibit an employer from retaliating against an employee "for having exercised or attempted to exercise FMLA rights."  <u>Budhun v. Reading Hosp. & Med. Ctr.</u>, 765 F.3d 245, 256 (3d Cir. 2014) (quoting 29 C.F.R § 825.220(c)).  To succeed on a FMLA retaliation claim, a plaintiff must show that "'(1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights.'"  <u>Id.</u> (quoting <u>Lichtenstein v. Univ. of Pittsburgh Med. Ctr.</u>, 691 F.3d 294, 302 (3d Cir. 2012)).

#### 2.      Plaintiff's FMLA Retaliation Claim

In support of their motion for summary judgment, Defendants argue that "[w]hile FMLA paperwork was provided to [Plaintiff] in close proximity to the Board's acceptance of her

resignation, the record is absolutely devoid of any connection between taking, or preparing to take leave and the Board's vote to accept her resignation." (Doc. No. 163 at 20.) Further, Defendants state that Plaintiff cannot show that she "opposed any act or practice made unlawful by the FMLA or that she participated in any manner in an investigation, proceeding or hearing under the FMLA," pointing to Plaintiff's responsibility for overseeing the administration of the District's FMLA policy and benefits. (Id. at 21.) In addition, Defendants note that Plaintiff had 249 days of sick leave and 30 vacation days available to her "before she would have need to take FMLA leave." (Id.)

In opposition, Plaintiff indicates that the circumstances surrounding her request for FMLA paperwork and the end of her employment with the District demonstrate a causal connection between her invocation of FMLA protections and what she interprets as an adverse employment action. (Doc. No. 167 at 24.) Plaintiff also notes that "at the time of her request for FMLA [leave] . . . [she] had met the 1250 hour requirement and, arguably, the serious medical condition requirement[,] given her cardiac symptoms evidenced in the record, and that, but for the District's administrative policies, she would have been eligible for FMLA [leave]." (Id.) Defendants argue that the recent decision in Plaintiff's mandamus action impacts this Court's analysis of her FMLA claim because given that the state court "found that [Plaintiff] separated from her employment in order to pursue her constructive discharge claims in this Court," she "cannot also now claim that the cessation of her employment was causally related to her invocation of her rights to FMLA leave since she herself chose the time and place to separate from employment." (Doc. No. 179 at 10.) Defendants thus maintain that "[i]f [Plaintiff's] due process claim cannot proceed and this Court has already dismissed her constructive discharge claim, then there is no adverse job action caused by the Defendants." (Id.)

While Plaintiff's supplemental brief does not appear to address the specific issue of how the subsequent mandamus ruling impacts her FMLA claim, Plaintiff describes the timeline of events related to the end of Plaintiff's employment as follows:

> After the incessant discriminatory abuse by Defendants over a long period finally led to stress induced nose bleeds and cardiac issues, Plaintiff took sick leave on the advice of her doctors and requested FMLA leave. When complaints about the treatment of her had no effect, Plaintiff filed suit to protect her job on April 17, 2014 and her doctor sent a letter to Defendants advising them that Plaintiff would be on sick leave for an indefinite period. Being prepared to argue that being forced to take sick leave was the functional equivalent of being forced to resign, Plaintiff included a claim for constructive discharge in her [c]omplaint. Despite receiving the doctor's letter from Plaintiff's doctor, the Defendants voted to "accept Plaintiff's resignation" – alleging that the pleading of constructive discharge constituted a resignation as a matter of law.

(Doc. No. 184 at 2.)

The Court concludes that no reasonable factfinder could find for Plaintiff in regard to her FMLA retaliation claim, as the applicable District policy required Plaintiff to exhaust her sick leave prior to invoking her FMLA leave. (Doc. No. 157 ¶ 12.) Given that it is undisputed Plaintiff was required to exhaust approximately thirty-five weeks of paid leave prior to using FMLA leave, Plaintiff has not put forth sufficient evidence to establish a causal link between any adverse employment and the exercise of her FMLA rights. Accordingly, Defendants' motion for summary judgment will be granted as to Count VIII of the third amended complaint.

### G. First Amendment Retaliation (Count IX)

In Count IX of the third amended complaint, Plaintiff brings a claim against the District, Karl, Rawls, and Sussman of a violation of her right to petition the government under the First Amendment to the U.S. Constitution. (Doc. No. 39 at 34.) Plaintiff alleges that she "has exercised [this] right by filing the initial [c]omplaint in the Middle District of Pennsylvania to redress her grievances she has encountered" (id. ¶ 170), and that after she filed that complaint,

the District "attempted to incorrectly characterize her lawsuit as a 'resignation' and/or a breach of her contract" (id. ¶ 171).

### 1.     Legal Standard

In the context of a First Amendment retaliation claim, a plaintiff must establish that: "(1) the plaintiff participated in activity protected by the First Amendment; (2) the defendant[s] retaliated against the plaintiff in a manner that would be 'sufficient to deter a person of ordinary firmness from exercising his constitutional rights;' and (3) a causal nexus existed between the protected activity and the retaliation." Alers v. City of Phila., 919 F. Supp. 2d 528, 553 (E.D. Pa. 2013) (quoting Thomas v. Indep. Twp., 463 F.3d 285, 296 (3d Cir. 2006)). Further, "[r]etaliatory actions that violate an employee's First Amendment rights may be adverse where they relate to 'promotion, transfer, recall and hiring,' not where they are simply 'criticism, false accusations, or verbal reprimands.'" Id. at 554 (quoting Brennan v. Norton, 350 F.3d 399, 419 (3d Cir. 2003)).

"Although a plaintiff alleging retaliation for protected speech . . . must ordinarily establish that his/her speech was a matter of public concern . . . the same is not true where the speech itself constitutes the plaintiff's lawsuit." Brennan, 350 F.3d at 417 (citing San Filippo v. Bongiovanni, 30 F.3d 424, 434-43 (3d Cir. 1994)). Further, filing a lawsuit is a constitutionally-protected activity. See, e.g., Anderson v. Davila, 125 F.3d 148, 161 (3d Cir. 1997).

### 2.     Plaintiff's First Amendment Retaliation Claim

Defendants argue that Plaintiff cannot establish the aforementioned elements because "[i]t is undisputed . . . that the Board construed statements in the [c]omplaint as her pronouncement that she could no longer work in her position of [s]uperintendent" and "[t]he Board was not motivated by [Plaintiff's] act of filing her original [c]omplaint." (Doc. No. 163

at 24.)  In opposition, Plaintiff maintains that her protected speech was impermissibly chilled when the Board construed her filing of a complaint as her resignation.  (Doc. No. 167 at 26-27.)

The Court concludes that Defendants are not entitled to summary judgment as to Plaintiff's First Amendment retaliation claim.  As an initial matter, the Court recognizes that Plaintiff's initiation of the above-captioned action through her filing of the original complaint is a constitutionally-protected activity.  See, e.g., Anderson v. Davila, 125 F.3d at 161.  Further, Plaintiff has produced sufficient evidence to permit a reasonable factfinder to conclude that Defendants were motivated by her filing of a complaint to effectively terminate her, especially in light of the Board's reference to Plaintiff's original complaint in the meeting minutes related to their vote to accept what they deemed her resignation.  (Doc. No. 157 ¶ 168) (noting that the Board's statement read, in pertinent part, that the Board "recommends that the Board accept the resignation of [Plaintiff] that is implicit with the term 'constructive discharge'").

Under the applicable legal standard, a reasonable factfinder could conclude that such conduct would be sufficient to deter an individual of ordinary firmness from exercising his or her constitutional rights, and that a causal nexus existed between the protected conduct and the retaliatory act.  See Alers, 919 F. Supp. 2d at 553 (articulating elements of a First Amendment retaliation claim).  The Court will therefore deny summary judgment as to Count IX of the third amended complaint.

**H.      Retaliation Under the Pennsylvania Constitution (Count X)**

The basis for Plaintiff's claim against Defendants for a violation of Article 1, Section 20 of the Pennsylvania Constitution in Count X of the third amended complaint is that Plaintiff exercised her right to petition the government, which is articulated in the state constitution, by filing her initial complaint in this Court, and that Defendants violated this right when they

construed her complaint as a resignation and voted to accept said resignation. (Doc. No. 39 at 35-36.)

### 1.     Legal Standard

Article 1, Section 20 of the Pennsylvania Constitution states that "[t]he citizens have a right in a peaceable manner to assemble together for their common good, and to apply to those invested with the powers of government for redress of grievances or other proper purposes, by petition, address or remonstrance." See PA. CONST. Art. 1, § 20 (setting forth "right of petition"). Plaintiff's state constitutional retaliation claim may be analyzed in accordance with the federal standard articulated supra, as the parties discuss the state constitutional claim in the context of federal law. See, e.g., Wood v. Univ. of Pittsburgh, 395 F. App'x 810, 813 n.1 (3d Cir. 2010) (applying the same analysis to gender discrimination claims under the Pennsylvania Human Relations Act and Title VII).

### 2.     Plaintiff's Retaliation Claim Under the Pennsylvania Constitution

As it relates to Plaintiff's retaliation claim under the Pennsylvania Constitution, both Defendants and Plaintiff appear to make the same arguments recited in the previous section that they asserted with regard to Plaintiff's First Amendment Retaliation claim. The parties also make the same arguments in their supplemental briefing in regard to Plaintiff's state constitutional claim that they do with respect to her First Amendment claim.

In light of the Court's conclusion as to Plaintiff's First Amendment retaliation claim, the Court finds that Defendants are not entitled to summary judgment as to Plaintiff's retaliation claim under the Pennsylvania constitution. Accordingly, Defendants' motion for summary judgment will be denied as to Count X of the third amended complaint.

### I.     Sex Discrimination in Violation of Title VII (Count XII)

Count XII of the third amended complaint sets forth a claim of sex discrimination in violation of Title VII against Defendants on the basis that: (1) Rawls, as a Board member, "has stated to Plaintiff that she would pave the way for an African American male to be hired as Superintendent" (Doc. No. 39 ¶ 197); (2) "Rawls has publicly referred to Plaintiff as a 'bitch' and [stated] that the [District] is run by 'three white bitches'" (id. ¶ 198); and (3) that following the District's "wrongful termination of Plaintiff . . . the Board subsequently hired Dr. Jeffery Miller, a Caucasian male, as Acting Superintendent" (id. ¶ 199).[20]

### 1. Legal Standard

In order to prevail on a claim of gender discrimination in violation of Title VII, a plaintiff must first establish a prima facie case of discrimination. This requires the plaintiff to show: (1) she is a member of a protected class; (2) she is qualified for the position; (3) she suffered an adverse employment action; and (4) those outside the protected class were treated more favorably. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); see also Tex. Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 253 (1981). In addition, the fourth prong may be established through evidence showing that the employment decision was made "under circumstances that give rise to an inference of unlawful discrimination." See id. A plaintiff is not required to show comparative evidence involving treatment of those outside the protected class in order to show that the adverse action was taken in circumstances allowing for an inference of discrimination, but rather, "comparative evidence is just one manner in which a plaintiff can satisfy the prima facie requirement that the adverse action occurred under circumstances giving rise to an inference of discrimination." See Rey v. Univ. of Pittsburgh Sch.

---

[20] According to the third amended complaint, the EEOC issued Plaintiff a right-to-sue letter on January 7, 2015. (Doc. No. 39 ¶ 200.)

of Dental Med., 182 F. Supp.3d 282 (W.D. Pa. 2016) (quoting Blunt v. Lower Merion Sch. Dist., 826 F. Supp.2d 749, 758 (E.D. Pa. 2011)).

If the plaintiff makes the requisite showing and establishes a prima facie case of discrimination, the defendant must articulate a legitimate non-discriminatory reason for the adverse employment action. See McDonnell Douglas, 411 U.S. at 802. If the defendant meets this burden, the burden returns to the plaintiff to show that the employer's stated reason for the adverse employment action is a pretext for discrimination. See id. In evaluating the pretext element of the burden-shifting framework, a plaintiff must provide evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Palmer v. Fed. Express Corp., 235 F. Supp. 3d 702, 715 (W.D. Pa. 2016) (citing Michaels v. BJ's Wholesale Club, Inc., 604 Fed. Appx. 180, 182 (3d Cir. 2015)).

### 2.    Plaintiff's Sex Discrimination Claim

In support of their motion, Defendants argue: that Plaintiff "fails to show that Defendants hired a replacement Superintendent under circumstances that give rise to any inference of discrimination" (Doc. No. 163 at 28); that Plaintiff cannot point to evidence that similarly situated individuals outside her protected class were treated more favorably than she (id.); and that Plaintiff can offer no evidence to overcome its legitimate non-discriminatory reason for its employment decision–"the perceived resignation" (id.). Defendants refer to Plaintiff's deposition testimony, which they state demonstrates her lack of awareness of the qualifications of others who were candidates for Superintendent, and argue that even if Plaintiff were so aware,

she "admits to the candidates' qualifications and offers not a scintilla of evidence to the contrary . . . [and] makes absolutely no mention of sex being a factor."  (Id. at 29.)

In opposition, Plaintiff states that the evidence of record, as explained through her statement of material facts, demonstrates that a reasonable factfinder could "find that Plaintiff was treated less favorably than the male superintendents that came before and after her."  (Doc. No. 167 at 27-28).  Plaintiff also appears to argue that she is entitled to a trial on a hostile work environment claim, stating not only "that she was treated less favorably than the male superintendents that preceded and followed her, but that she [also] suffered treatment by Defendants that was outrageous, pervasive, and severe" so as to render summary judgment on her Title VII claim improper.  (Id. at 30.)

The Court concludes that Defendants are not entitled to summary judgment on Plaintiff's Title VII sex discrimination claim, as Plaintiff has adduced sufficient evidence from which a reasonable factfinder could conclude that Plaintiff did not resign, but rather, was terminated in a manner that was a pretext for unlawful discrimination in violation of Title VII.[21]  Construing the relevant facts in a light most favorable to Plaintiff, the Court finds that Plaintiff has put forth evidence that Rawls, a member of the Board that carried out what Plaintiff argues was an adverse employment action against her, referred to her using the term "bitch."  (Doc. No. 122-2) (providing Plaintiff's deposition testimony in which she states that Rawls referred to her using such an expletive).

_____

[21] At oral argument, counsel for Plaintiff represented that Plaintiff was pursuing sex discrimination claims under both disparate treatment and hostile work environment theories. The Court notes that Plaintiff has not alleged a Title VII claim on the basis of a hostile work environment, and the Court previously dismissed Plaintiff's claim for constructive discharge based on such an environment.  Accordingly, the Court addresses only Plaintiff's Title VII claim alleging disparate treatment in connection with the end of her employment with the district.

Further, Plaintiff has proffered evidence that her job performance as superintendent did not warrant being terminated, and that similarly-situated male employees did not experience the same working conditions of which she complains. Specifically, Plaintiff asserts that evidence demonstrates that male superintendents whose tenures preceded and succeeded hers were treated more favorably than she was, despite Plaintiff's job performance. DelGrande testified that a group of individuals would meet at Finnerty's home, attend Board meetings, and behave disruptively therein (Doc. No. 122-7 at 21-22), and that Sussman, Karl, Dietrich and Rawls encouraged this behavior (id. at 22). Further, the record suggests that male superintendents were not subjected to such behavior, and public criticism of male superintendents was prevented. (Doc. No. 157 ¶ 117.) In her deposition, DelGrande also stated that Plaintiff was instructed not to speak at Board meetings (Doc. No. 122-7 at 34), yet male superintendents did not face such a restriction (id.), and that the Board also demanded that Plaintiff form a disciplinary committee to involve community members in the District's disciplinary process (id. at 59), while declining to impose such a requirement on male superintendents (id.). Such a discrepancy in Board-imposed requirements was also reported with respect to preapproval of checks. (Doc. Nos. 122-7 at 60, 157 ¶ 120). Lastly, evidence of record also indicates that Sussman, through activities such as frequent emails to Plaintiff and attempting to impose a District-wide survey to evaluate Plaintiff, interacted with Plaintiff in such a way that was not experienced by male superintendents. (Doc. Nos. 122-7 at 14-15, 37-38, 55, 122-8 at 42-43.) Accordingly, the Court concludes that Defendants have not met their burden of demonstrating that no genuine issue of material fact exists with regard to Plaintiff's sex discrimination claim. See, e.g., Jackson v. Commonwealth of Pa., 218 F. Supp.3d 332, 337 (M.D. Pa. 2016) (quoting Abdul-Latif. v. Cty. of Lancaster, 990 F. Supp.2d 517, 526 (E.D. Pa. 2014)) ("Similarity between comparators is generally a question of

fact for a jury, but 'summary judgment is appropriate where there is no evidence from which a jury could conclude the parties were similarly situated.'").  In light of such evidence, the Court concludes that Plaintiff has met her burden in establishing a prima facie case of sex discrimination.[22]

In addition, the Court rejects Defendants' argument that Plaintiff has failed to produce evidence that would permit a reasonable factfinder to conclude that Defendants' legitimate, non-discriminatory reason was a pretext for discrimination on the basis of sex.  As an initial matter, Plaintiff's evidence offered in support of her prima facie case may also be used at the pretext stage of the McDonnell Douglas analysis.  See Farrell v. Planters Lifesavers Co., 206 F.3d 271, 286 (3d Cir. 2000) ("As our cases have recognized, almost in passing, evidence supporting the prima facie case is often helpful in the pretext stage and nothing about the McDonnell Douglas formula requires us to ration the evidence between one stage or the other.").  As noted above, a plaintiff can demonstrate pretext by showing that the employer had subjected her to unlawful discriminatory treatment, or that the employer treated other, similarly situated persons outside of the protected class more favorably.  In this case, Plaintiff's evidence satisfying the fourth element of the prima facie case also satisfies her burden of showing pretext.[23]

For the reasons explained supra, the Court will deny Defendants' motion for summary judgment as to Count XII of the third amended complaint.

---

[22] Defendants either deny these statements or dispute their import.  However, for purposes of resolving the instant motion for summary judgment, the Court views these disputes in favor of Plaintiff, the non-moving party.

[23] In addition, the Court disagrees with Defendants' additional argument that Plaintiff's alleged failure to invoke the complaint process in her employment agreement shows that the Board's reason for ending her employment was not pretextual.  While Defendants may be able to present evidence to a jury that while Plaintiff complained about abuse from the Board, she did not invoke the complaint process in her agreement and thus the Board did not act with pretext in construing her lawsuit as a resignation, there is insufficient evidence to support a grant of summary judgment on Plaintiff's sex discrimination claim.

**J.      Plaintiff's Constructive Discharge Claim**

 The Court notes that, prior to this action being reassigned to the undersigned, the Court dismissed Plaintiff's constructive discharge claim, reasoning that the allegedly discriminatory remarks made by Rawls were made by "only one member of the nine-member Board," and, thus, did "not create the reasonable inference that the entire Board intended to discriminate on the basis of gender or race" so as to warrant a constructive discharge claim.  (Doc. No. 34 at 18.)  At oral argument, Plaintiff noted that the Court dismissed Plaintiff's constructive discharge claim before discovery was complete, and that there is now ample evidence of record to support a constructive discharge claim.  Now having the benefit of complete discovery, the Court recognizes the importance of reexamining the law of the case as it applies to Plaintiff's constructive discharge claim.

The doctrine of the law of the case generally prohibits a court from allowing "the same factual and legal issues to be raised again" once already decided.  See Dasrath v. Cont'l Airlines, Inc., 467 F. Supp.2d 431, 442 (D.N.J. 2006).  There are, however, certain instances in which the doctrine does not apply so as to prevent reconsideration of an issue already decided, such as circumstances in which: "(1) new evidence is available; (2) a supervening new law has been announced; or (3) the earlier decision was clearly erroneous and would create manifest injustice."  See In re City of Phila. Litig., 158 F.3d 711, 718 (3d Cir. 1998) (identifying situations in which a court may reconsider a previously-decided issue).  As mentioned above, the Court finds that, having had the benefit of the discovery process, and in light of Plaintiff's contention that she did not leave her employment with the District voluntarily, reconsideration of the previous dismissal of Plaintiff's constructive discharge claim may be warranted.  However, the Court will not revisit this issue sua sponte, but will entertain a properly-filed motion for leave to

file an amended complaint including claims for constructive discharge and a hostile work environment.[24]  See Fed. R. Civ. P. 15(a)(2) (providing that if amendment sought is not authorized as a matter of course, "[i]n all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave" and stating that "[t]he court should freely give leave when justice so requires").

## IV.    CONCLUSION

Based on the foregoing, the Court will grant in part and deny in part Defendants' second motion for summary judgment.  (Doc. No. 152.)  An appropriate Order follows.

s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania

---

[24] See supra note 21.